**UNITED STATES of America, Plaintiff,**

v.

**BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant.**

No. 80 C 5124.

United States District Court,
N.D. Illinois, E.D.

June 30, 1983.

See also, D.C., 554 F.Supp. 912.

William Bradford Reynolds, Asst. Atty. Gen., Alexander C. Ross, Civil Rights Div., Dept. of Justice, Washington, D.C., Dan K. Webb, U.S. Atty., Margaret C. Gordon, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Robert C. Howard, Robert M. Weissbourd, Hartunian, Futterman & Howard, Chtd., C. Richard Johnson, Reynaldo Glover, Hugh R. McCombs, Jr., Isham, Lincoln & Beale, Chicago, Ill., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

This Court has conducted hearings on June 1, 7, 8, 22 and 27, 1983 on a petition filed by the Board of Education of the City of Chicago ("Board"). It has considered the testimony and exhibits submitted at those hearings, designations from the deposition testimony of Monika Edwards Harrison and Jack Simms, affidavits of those two deponents and of Carol Cichowski and J. Maxey Bacchus ("Bacchus"), stipulations of the parties and the United States' answers to the Board's First and Second Set of Interrogatories and First Request To Admit.

*Findings of Fact ("Findings")*

Based on all the evidence this Court determines pursuant to Fed.R.Civ.P. ("Rule") 52(a) that each of the following Findings is supported by a preponderance of all the evidence now before it: [1]

---

1. Each party has stipulated to the authenticity and genuineness of the other party's documen-

1.  This is a proceeding to enforce compliance with a Consent Decree between the United States of America and Board, the terms of which were embodied in this Court's September 24, 1980 Order. Specifically, it is to determine the nature and extent of the United States' obligations undertaken by the inclusion of Consent Decree I § 15.1 ("Section 15.1," App. A).

2.  Since September 24, 1980 Board has made good faith efforts to implement fully the Comprehensive Student Assignment Plan and the Educational Components of the Chicago desegregation plan (collectively "the Plan"). [Stip.]

3.  Since September 24, 1980 Board has made every good faith effort to find and provide every available form of financial resources adequate to pay the cost of full implementation of the Plan. [Bacchus Testimony]

4.  Since September 24, 1980 Board has expended approximately $120 million in its efforts to implement fully the various elements and components of the Plan. [Stip.]

5.  In school year 1982–83 [2] Board has expended or will expend approximately $57.9 million to implement the Plan. [Stip.]

6.  For school year 1983–84 Board has budgeted $66.9 million for implementation of the Plan. [Stip.]

7.  Board presently projects a budget deficit of approximately $200 million for its 1983–84 fiscal year. [Stip.]

8.  During school year 1980–81, specifically on September 28, 1980, Board received a Title IV planning grant in the amount of $422,800. [Stip.]

9.  During school year 1980–81, specifically on June 15, 1981, Board received a Title IV grant in the amount of $298,639. [Stip.]

10.  During school year 1981–82, specifically on September 22, 1981, Board received an out-of-cycle Emergency School Aid Act ("ESAA") grant in the amount of $1,813,-025, in response to an application that requested $23,138,977. All the reasons for the difference in funding are not before this Court. [Stip.]

11.  All the amounts of funding referred to in Findings 8–10 were received directly from the United States through the Department of Education or its predecessor agency, the Office of Education of the Department of Health, Education and Welfare, and were available to Board for implementation of the Plan. [Stip.]

12.  During school year 1982–83 Board received a block grant pursuant to the Educational Consolidation and Improvement Act of 1981 ("ECIA") in the amount of $5.385 million, of which $1.8 million was allocated by Board for implementation of the Plan. Board used the remainder of the block grant to fund other educational programming allowable under ECIA, which would not have been funded absent the allocation of block grant money. [Bacchus Testimony]

13.  Board received approximately $674,-432 of desegregation-related assistance under Title VII for school year 1981–82 and approximately $528,267 for school year 1982–83. [Stip.]

14.  Beginning in federal fiscal year 1981,[3] and for federal fiscal years 1982 and 1983, it has been a priority and a policy objective of the Executive Branch of the United States and the Department of Education to dismantle the Department of Edu-

tary exhibits and that copies may be used in lieu of originals. There has been no stipulation as to admissibility. Brackets in each Finding indicate the evidentiary source of the Finding. "Stip." refers to the agreements contained in the Joint Statement of the Parties Concerning Proposed Findings of Fact, rather than indicating the underlying evidence. Some of the "Stip." Findings are agreed to, while others are simply not disputed by the United States.

Some are claimed by the United States to be irrelevant, though undisputed.

2.  Board's "school year" is its fiscal year beginning September 1 and ending the following August 31.

3.  Federal fiscal years begin October 31 and end the following September 30. Thus "fiscal year 1981" is the year ended September 30, 1981.

cation and turn most of its functions over to state educational agencies. [Stip.]

15. Since federal fiscal year 1981 it has been the policy of the Department of Education not to provide desegregation assistance to local educational agencies through direct grants to local educational agencies of funds appropriated by Congress under Title IV of the Civil Rights Act of 1964 ("Title IV"). [Harrison Dep. 35–36; Sims Dep. 11–14; Bd. Ex. 16]

16. After federal fiscal year 1981 the Executive Branch of the United States and the Department of Education sought repeal of all categorical programs under which the United States could provide direct grants to local educational agencies for desegregation assistance and replacement of those programs, along with all categorical programs under which the United States provided other assistance to local educational agencies, with a block grant of federal funds. Such block grants are allocated to local educational agencies by the states and can be used for the various purposes set forth in ECIA, including the purposes of the former ESAA programs. Title IV remains as a categorical program, as is more fully explained in other Findings. [Stip.]

17. Since federal fiscal year 1981 it has been the policy of the Department of Education and the Executive Branch of the United States to reduce the total amount of funds provided by the United States to the states for the various purposes set forth in ECIA. [Request To Admit Nos. 25, 26.]

18. Since federal fiscal year 1981 it has been the policy of the Department of Education and the Executive Branch of the United States not to seek any legislation or appropriation other than through ECIA that would provide direct financial assistance for desegregation to local educational agencies implementing desegregation plans, and specifically to Board. [Harrison Dep. 105–06; Bd. Ex. 16]

19. All the United States' policy decisions not to provide direct grants to local educational agencies pursuant to Title IV, to provide funding to the states only through block grants, to reduce federal funding to the states for any of the purposes listed in the block grant legislation, and not to seek legislation or appropriations that would directly provide financial desegregation assistance to Board, were determined by the general priority and objective of dismantling the Department of Education and turning most of its functions over to state governmental agencies. [Stip.]

20. Since fiscal year 1981 it has been the policy of the Department of Education to use funds in the Secretary's Discretionary Fund only for the programs required by 20 U.S.C. § 3851(b) or to support projects for research, demonstrations, training, dissemination or other activities that address some national education emphasis, as determined by the Secretary, not including the funding of specific desegregation plans. [Harrison Dep. 124; Request To Admit 27; Bd. Ex. 25]

21. In fiscal year 1981 and in each of the succeeding fiscal years it was, and still is, the position of the Department of Education that it could not and would not approve state educational agency criteria for allocation of block grant funds that were based in part on the amounts local agencies within the state received or could have received under ESAA because such criteria would not adequately reflect "a higher than average cost per child." [Harrison Dep. 133–35; Harrison Dep. Ex. 26, 27]

22. In its development of the policies and in taking its actions described in Findings 14–21, the United States did not give any consideration to its obligations under the Consent Decree in general and under Section 15.1 in particular. [Harrison Dep. 41]

23. Before October 1, 1982 ESAA was the primary means for the United States to provide direct desegregation assistance to local educational agencies. [Stip.]

24. In furtherance of the policies and priorities described in Findings 14–21, the Executive Branch of the United States and the Department of Education have:

(a) requested a significant reduction in ESAA funding from Congress for fiscal 1981; [Stip.]

(b) requested no ESAA funding from Congress for fiscal 1982; [Request To Admit 11]

(c) sought and supported in Congress the repeal of ESAA, which became effective October 1, 1982; [Request To Admit 6]

(d) supported the passage by Congress of the ECIA block grant legislation (as described in Finding 15), which became effective October 1, 1981; [Stip.]

(e) requested from Congress for fiscal 1982 an appropriation of ECIA block grant funding in the amount of $487,525,-000, which was (1) $103,843,000 less than Congress had authorized and (2) $50,852,-828 less than the amount appropriated by Congress in fiscal 1981 for the categorical grant programs, including ESAA, which the ECIA block grant funding was intended to replace; [Request To Admit 25]

(f) requested from Congress for fiscal 1983 an appropriation of ECIA block grant funding in the amount of $406,080,-000, which was (1) $183,288,000 less than Congress had authorized and (2) $130,-297,828 less than the amount appropriated by Congress in fiscal 1981 for the categorical programs, including ESAA, which ECIA block grant funding was intended to replace; [Request To Admit 26]

(g) continued a similar request policy for fiscal 1984; [Stip.]

(h) done nothing to ensure that, in fiscal 1982 and 1983, any portion of the ECIA block grant for Illinois was used to support a purpose related to school desegregation; [Harrison Dep. 120]

(i) opposed congressional efforts to re-enact ESAA; [Stip.]

(j) failed to request from Congress in fiscal 1982 and 1983 an appropriation to fund any desegregation programs contemplated by Title IV; [Harrison Dep. 34; Request To Admit 13, 16]

(k) in each of fiscal 1982 and 1983 requested Congress to rescind the $24,000,-000 of Title IV funding Congress had previously appropriated; [Harrison Dep. 48]

(*l*) in fiscal 1983 requested Congress to rescind $2.54 million appropriated to the Secretary of Education's Discretionary Fund; [Stip.]

(m) requested Congress to rescind $41,-600,000 appropriated to the Department of Education for special programs and populations, other than Title IV programs, in fiscal 1982 and to rescind at least $28,000,000 appropriated for such programs in fiscal 1983; [Stip.]

(n) determined as a matter of policy to provide no Title IV funding in fiscal 1982 and 1983 to local educational agencies; [Harrison Dep. 26, 35–36; Request To Admit 15]

(*o*) requested Congress to rescind approximately $900 million in unexpended student loan funding; [Bd. Ex. 28 at 61]

(p) failed to use any portion of the Secretary of Education's Discretionary Fund in fiscal 1982 and 1983 for a direct grant of desegregation assistance to any local educational agency; [Request To Admit 31]

(q) failed to urge state educational agencies to adopt criteria for determining the allocation of block grant funds to "high cost children" that include giving particular consideration or weight to a local educational agency implementing a desegregation plan. [Request To Admit 22, 23]

25. Terrel H. Bell has been Secretary of Education since January 21, 1981. He is responsible for the formulation of the policies and priorities set forth in Findings 14–21 and for the actions taken by the Department of Education to implement those policies and priorities. Since January 21, 1981 he has also been responsible for ensuring that the Department of Education fulfills all its obligations under the Consent Decree, including specifically the obligations imposed by Section 15.1. [Harrison Dep. 12, 32–34, 107, 114.]

26. Monika Edwards Harrison is Director, Policy Planning and Executive Operations, Office of Elementary and Secondary

Education, Department of Education. Her immediate superior is Laurence Davenport, Assistant Secretary for Elementary and Secondary Education. Mr. Davenport reports directly to Mr. Bell, the Secretary of Education. [Stip.]

27. Ms. Harrison was responsible for making the policy recommendation to Mr. Bell, through her superior Mr. Davenport, that Title IV funds in fiscal 1982 and 1983 not be used to provide the desegregation assistance contemplated by the purposes of Title IV to local educational agencies, including Chicago. Mr. Bell accepted this recommendation and made it a policy decision of the Department of Education. [Stip.]

28. Ms. Harrison was responsible for making the policy recommendation to Mr. Bell, through her superior Mr. Davenport, that the Department of Education seek to rescind in Congress the Title IV funds appropriated by Congress for use in fiscal 1982. [Harrison Dep. 48]

29. Title IV funds appropriated by Congress for use in fiscal 1982 and 1983 were distributed as direct grants to state educational agencies and desegregation assistance centers. In fiscal 1982 the Illinois Department of Education received a Title IV grant in the amount of $705,832. Desegregation assistance centers that could provide technical and in-service training desegregation assistance to Board are located only at Indiana University, in Bloomington, Indiana and the University of Wisconsin branch in Milwaukee, Wisconsin. Only the center at Indiana University is a race-specific desegregation assistance center. In fiscal 1982 the Title IV grant to the Indiana University center was $311,629. In fiscal 1982 the Title IV grant to the University of Wisconsin-Milwaukee center was $385,560. [Stip.]

30. In fiscal 1982 and 1983 the Department of Education took no actions to ensure that Board received the desegregation assistance contemplated by Title IV from the Illinois Department of Education and the desegregation assistance centers described in Finding 29. [Harrison Dep. 45–47, 147, 154; Sims Dep. 36, 38]

31. In fiscal 1982 the Department of Education made Title IV grants to 42 state educational agencies. There are 49 such applicants for 1983. In fiscal 1982 the Department of Education made Title IV grants to 25 desegregation assistance centers, and it plans to make similar grants in fiscal 1983. [Response To Int. 16, 17]

32. Use of the Title IV appropriations in fiscal 1982 and 1983 to fund state educational agencies and desegregation assistance centers by definition reduced the level of technical and in-service training assistance available to Board from the levels of such assistance available to it under Title IV in prior fiscal years.

33. In fiscal 1982 and 1983 the Department of Education took no actions toward providing a grant of Title IV funds to Board to assist its implementation of the Plan. [Harrison Dep. 26, 35–36]

34. In fiscal 1982 the Secretary of Education or his delegee had the authority to provide a grant of Title IV funds to Board to assist its implementation of the Plan, and it is still within the Secretary's discretion to do so. [Harrison Dep. 70–71]

85. Of the Title IV funds appropriated to the Department of Education by Congress in fiscal 1982, $24,000,000 remains unobligated at this time. [Stip.]

36. No state educational agency ("SEA") will cease operation solely because it failed to receive a grant of Title IV funding in fiscal 1983. [Harrison Dep. 147–48] No SEA program will cease to exist solely because that program failed to receive Title IV funding in fiscal 1983. [Sims Dep. 24–25; Harrison Dep. 147–48] No desegregation assistance center ("DAC") will cease operation solely because it failed to receive a grant of Title IV funding in fiscal 1983. [Stip.]

37. Some largely administrative inconvenience may result for DAC and SEA projects currently receiving Title IV funding from delaying any obligation of such funding beyond August 15, 1983. There is

no evidence those projects would suffer substantial harm from the delay in further obligation of funding. There is also no evidence most of those projects could not continue even without receiving the funding after August 15. Nothing in the record shows those projects would not receive funding from other sources or receive continued support from the state agencies and universities with which nearly all of them are affiliated.

38. Delay in obligating Title IV funding for new DAC and SEA projects similarly will result in some largely administrative inconvenience, which cannot be considered substantial harm. Delay until August 1 in obligating monies from the Discretionary Fund will create some administrative inconvenience and minor detrimental effects on planning, but will also not cause substantial harm.

39. Both the Secretary of Education and the Department of Education recognize that the implementation of a desegregation plan can impose a higher educational cost per child on the school district that is implementing the Plan. [Request To Admit 22]

40. For fiscal 1982 $28,224,000 was allocated to the Secretary of Education's Discretionary Fund. In fiscal 1982 the Department of Education took no actions toward providing a grant from the Secretary's Discretionary Fund to Board to assist its implementation of the Plan. [Request To Admit 28, 31]

41. For fiscal 1983 $28,765,000 was allocated to the Secretary of Education's Discretionary Fund. In fiscal 1983 the Department of Education has taken no actions toward providing a grant from the Secretary's Discretionary Fund to Board to assist its implementation of the Plan. [Request To Admit 29, 31]

42. Of the amounts appropriated in fiscal 1982 and 1983 for the Secretary's Discretionary Fund, $10,725,000 had to be used each fiscal year to support certain programs mandated by Congress. In fiscal 1982 the Secretary of Education or his delegee had the authority to grant all or part of the remaining unencumbered funds in the Sec-

retary's Discretionary Fund to Board to assist its implementation of the Plan. Similarly, the Secretary of Education or his delegee had and has the authority to grant all or part of the unencumbered funds currently in the Secretary's Discretionary Fund to Board to assist its implementation of the Plan. [Request To Admit 27, 30; 20 U.S.C. § 3851]

43. There is $8,980,470 in the Secretary's Discretionary Fund for fiscal 1983 which remains unobligated at this time, without considering the three programs mandated by ECIA § 583(b). [Stip.]

44. Except as stated in Finding 48, the Executive Branch of the United States and the Department of Education have taken no action either to initiate legislation or to support pending legislation that would result in Board receiving direct financial assistance from the United States for implementation of the Plan. [Harrison Dep. 105–06]

45. Neither the Executive Branch of the United States generally nor the Department of Education specifically has taken any action toward reprogramming funds in a manner that would result in Board receiving direct financial assistance from the United States for implementation of the Plan. [Harrison Dep. 140]

46. Except as stated in Finding 48, the Executive Branch of the United States and the Department of Education have taken no action to seek congressional approval for reappropriating some portion of the excess student loan funds in a manner that would result in Board receiving direct financial assistance from the United States for implementation of the Plan. [Harrison Dep. 139–40, 143]

47. Board, through its counsel and its Superintendent of Schools Dr. Ruth ~B. Love, has repeatedly asked the Executive Branch of the United States and the Department of Education for direct financial assistance to enable Board to implement fully the Plan. Among these requests were the following:

(a) a June 2, 1982 letter to William Bradford Reynolds from Robert C. Howard, one of Board's attorneys; [Bd. Ex. 3]

(b) A July 12, 1982 letter to Mr. Reynolds from C. Richard Johnson and Mr. Howard, two of Board's attorneys, enclosing the outline for a "Federal Government Financial Plan for the Chicago Desegregation Plan"; [Bd. Exs. 4, 5]

(c) an August 3, 1982 letter to Alexander Ross of the Department of Justice from Hugh R. McCombs, Jr., one of Board's attorneys; [Bd. Ex. 7]

(d) an August 10, 1982 letter to Mr. Ross from Mr. Howard; [Bd. Ex. 8]

(e) a February 16, 1983 letter to Secretary of Education Terrel H. Bell from Dr. Love; [Bd. Ex. 17]

(f) a February 17, 1983 letter to Mr. Bell from Dr. Love; [Bd. Ex. 18]

(g) a May 13, 1983 letter to Mr. Bell from Messrs. Howard and Johnson; [Bd. Ex. 20] and

(h) a May 25, 1983 letter to Mr. Bell from Messrs. Howard and Johnson. [Bd. Ex. 19]

[Stip.]

48. Since entry of the Consent Decree the Executive Branch of the United States and the Department of Education have taken only the following actions (in addition to those referred to in Findings 8–10) to fulfill the obligations of the United States under Section 15.1: [4]

(a) Since early 1982 the Department of Justice has made telephone inquiries of Monika Harrison at the Department of Education to determine the amount of funding that could be made available to Board through the Office of Elementary and Secondary Education to assist Board's efforts fully to implement the Plan. [Stip.]

(b) In August 1982 Mr. Reynolds, head of the Civil Rights Division of the Department of Justice, met with Board members, Dr. Love, staff and Board counsel in Chicago to discuss the United States' efforts to provide funding to assist Board's efforts fully to implement the Plan. Mr. Reynolds told Board the United States would make no decision on funding until after this Court had decided the Plan was constitutional. [Stip.]

(c) Before August 1982 Ms. Harrison had taken actions, both personally and through her subordinates and colleagues at the Department of Justice, to identify funding that could be made available to Board through the Office of Elementary and Secondary Education to assist Board's efforts fully to implement the Plan. Those actions involved reading applicable statutes and regulations and budget documents. Before August 1982 Ms. Harrison concluded no such funding could be made available to Board, and her conclusion was communicated to the Department of Justice. Since then she has stated that conclusion to the Department of Justice in response to all inquiries concerning available desegregation funds for Board. [Harrison Dep. 26–26, 29–30]

(d) On September 14, 1982 Mr. Reynolds wrote the Secretary of Education asking him to identify any available sources of desegregation funding for the Plan. [Bd. Ex. 12]

(e) On November 15, 1982 the Secretary of Education replied in writing to Mr. Reynolds' letter. He stated the Department of Education could provide no direct desegregation funding to Board and such funding could be made available to Board through the ECIA block grant to the State of Illinois. [Bd. Ex. 16]

(f) On February 14, 1983 the Secretary of Education met in Washington with Board members, Dr. Love and Board counsel. During that conference Board asked Secretary Bell to seek direct federal funding to assist Board's efforts fully to implement the Plan. Despite that re-

---

**4.** "Stip." in the subparagraphs of this Finding 48 reflect the parties' agreement the specified actions were taken. It is the United States' position that other actions have been taken by it as well. Because this Court's ultimate Findings and Conclusions are not dependent on the specifics in that respect (given the United States' affirmative steps to disable itself from fulfilling its obligations, see Conclusion 4), the disputed areas are irrelevant to this order.

quest the Executive Branch sought no legislative initiative. [Bd. Ex. 17]

(g) On May 20, 1983 the Undersecretary of Education circulated a memorandum to the Assistant Secretaries of Education requesting them to examine ways to provide direct desegregation funding to Board. Attached to the memorandum was a copy of the Consent Decree. Before May 20, 1983 the Consent Decree had not been circulated within the Department of Education at either the Assistant Secretary or Director level. To date the Plan has not been circulated to or read by anyone within the Department of Education. [Harrison Dep. 16–17, 111–12; Sims Dep. 29–33]

49. For fiscal year 1983 Congress appropriated funds for a number of programs as to which the Executive Branch of the United States and the Department of Education have requested congressional rescission of the appropriated funds: $5.76 million for Women's Educational Equity, $19.440 million for Follow-Through, $960,000 for Territorial Training and $1.92 million for Aid to the Virgin Islands. Congress has not enacted the proposed rescission for the Special Programs and Populations account. Substantially all those funds remain unobligated as of June 27, 1983. [Stip.] By the end of fiscal year 1984 the Department plans to obligate all those funds. [Harrison Dep.]

50. In the March 30, 1983 *Federal Register* (48 F.R. 13220) the Department of Education published a notice:

(a) inviting applications for grants under the Secretary's Discretionary Program;

(b) announcing priorities in three areas: (1) expanding parental choice in education, (2) improving teacher quality through incentives and (3) strengthening local school boards;

(c) stating if funds are left after awards are made for those priorities, the Secretary would consider for funding unsolicited grant applications; and

(d) requiring the grant applications to be mailed or hand-delivered on or before August 1, 1983.

Chicago has not yet submitted an application under the program. [Cichowski Aff. ¶ 3; 48 F.R. 13220] At present Board is engaged in the process of completing an application it intends to submit to the Department of Education.

51. Harrison Aff. ¶¶ 5 and 6 state:

5. Chicago received $3,449,658 for FY 1980 under the antecedent programs included in Chapter 2; $6,784,273 for FY 1981 under these programs; and $6,258,256 for FY 1982 under Chapter 2.

6. In FY 1982, Chicago received 30% of the Chapter 2 funds received by the State of Illinois. In FY 1981, Chicago received 30% of the funds received by all grant recipients in Illinois under the antecedent programs of Chapter 2. In FY 1980, Chicago received 11% of the funds received by all grant recipients in Illinois under the antecedent programs.

In fiscal years 1980 through 1982 limited portions of the funds received by Chicago under those programs were expended pursuant to statute for children in private schools. [Stip.]

52. Information provided in the June 24, 1983 Affidavit of Jack A. Simms ¶¶ 10, 11 and 12 was provided to Board for the first time on June 22 and June 24, 1983. Board has not had an opportunity to examine the records or depose the personnel of the federal grantees involved.

53. Based on all the foregoing Findings, this Court finds the United States has failed to use its best efforts to find and provide all available financial resources adequate for full implementation of the Plan. On the contrary, since January 21, 1981 the Executive Branch of the United States and the Department of Education have been engaged in a continuous effort to strip away all means by which they could fulfill the United States' obligations under Section 15.1.

54. For each school year since 1981–82 Board has made or has budgeted "specific desegregation expenditures" for the purpose of Plan implementation. "Specific desegregation expenditures" are those ex-

penditures made by Board to implement programs specifically resulting from adoption of the Plan, such as magnet schools, voluntary transfer programs and compensatory educational remedies at racially isolated schools. In addition to specific desegregation expenditures, Board has made other expenditures that would have occurred absent the Plan, but that are significantly impacted and directed by the implementation of the Plan. Those include, for example, expenditures devoted to reassessment and placement of special education students pursuant to the Educational Components of the Plan. [Stip.]

55. For school year 1981–82 Board expended approximately $38.8 million for specific desegregation expenditures. In addition Board incurred expenditures for reassessment and placement of special education students totalling approximately $4 million pursuant to the provisions of the Plan. [Stip.]

56. For school year 1982–83 Board will expend approximately $56.9 million in specific desegregation expenditures. In addition to those specific desegregation expenditures, Board devoted approximately $4.2 million to the reassessment and placement of special education students pursuant to the provisions of the Plan. [Stip.]

57. For school year 1983–84 Board has budgeted approximately $66.9 million for specific desegregation expenditures. It projects an operating budget deficit of approximately $200 million for that year, including the budgeted level of specific desegregation expenditures. With the exception of an increase of $10 million for specific desegregation expenditures, the $200 million budget deficit is based on an assumption that services and programs will be maintained at their 1982–83 level. It does not assume any expansion of programs or services or general increases in compensation for Board employees. [Stip.]

58. Any amounts over and above the $66.9 million budgeted for school year 1983–84 that are devoted by the Board to Plan implementation and are not provided from funding sources external to the Board will increase the Board's presently projected $200 million deficit. [Stip.]

59. Board needs approximately $163 million over 5 years to rehabilitate the facilities of schools that are racially isolated minority schools. Board's projected expenditures for school year 1983–84 do not include an expenditure for the rehabilitation of any facilities. [Bacchus Testimony]

60. Board does not now have financial resources adequate fully to implement the Plan in school year 1983–84 and does not expect to obtain such funds from the external and internal sources of revenue projected to be available to it in that fiscal year. [Bacchus Testimony]

*Conclusions of Law ("Conclusions")*

Based on the foregoing Findings, this Court has made and hereby states the following Conclusions in accordance with Rule 52(a):

1. On September 24, 1980 this Court properly approved and entered a Consent Decree between the United States and Board. That Consent Decree was properly executed by the Attorney General, who has plenary power to conduct and supervise all government litigation. *ICC v. Southern Railway Co.,* 543 F.2d 534, 535 (5th Cir. 1976). It is an "order granting an injunction" within the meaning of Rule 65(d), *ILA, Local 1291 v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 75, 88 S.Ct. 201, 207, 19 L.Ed.2d 236 (1967), and is binding on the United States and all its officers, agents, servants, employees and attorneys.

2. Consent decrees are binding orders that have the same force as any other judgment. Accordingly the Consent Decree is fully enforceable by this Court. *United States v. City of Miami, Florida,* 664 F.2d 435, 440 (5th Cir.1981).

3. Consent decrees also have many of the attributes of contracts and are construed according to contract principles. Accordingly the scope of a consent decree will be discerned from its four corners, *United States v. Armour & Co.,* 402 U.S. 673, 682,

91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), although interpretive aids consistent with contract law may be used if necessary. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975).

■ 4. Section 15.1 is unambiguous in its terms. It clearly expressed and continues to express the mutual intent of the parties, and does not require extrinsic evidence to be construed. Even if it were to be viewed otherwise, and if resort were had to other parol evidence materials submitted by the United States in reliance on *White v. Roughton,* 689 F.2d 118 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983),[5] these Conclusions would be the same. In essence the United States seeks to parse Section 15.1 in an impermissible way, arguing the word "available" is a term of limitation that circumscribes what it must do to find and provide "financial resources"—money—adequate to implement the Plan. "Available" might alternatively be viewed as simply a term of emphasis (it is directly coupled with

"every")[6] or as tautological (after all, by definition "unavailable" financial resources could not be provided). But the shades of meaning need not be resolved in the circumstances of this case. What the United States glosses over is that it could not in good faith, having entered into the Consent Decree, work actively to make financial resources *unavailable.* That would permit a contracting party deliberately and by its own unilateral action to flout its own contractual undertaking and its obligations to this Court as well as to Board. Yet that is precisely what the United States has done—and it acknowledges having done so, for it has stipulated to most of the Findings to that effect. For that reason it is entirely proper to require the United States to take all affirmative steps available to it *to seek to make available* financial resources adequate for implementation of the Plan. And that is so whether or not, absent its prior conduct to frustrate the Consent Decree and its obligations under Section 15.1, that would have been the required reading of that Section.[7]

---

**5.** *White* involved a situation very different from the present one. There the literal terms of the consent decree were at war with common sense, and the court considered the parties could not have intended its literal meaning. That is not at all the case here, and this Court need not explore the possible implications of *White* in other circumstances.

**6.** Indeed one of the United States' tendered documents as part of its Group Ex. 1 makes that point graphically. In the June 19, 1980 letter from Assistant Attorney General Drew Days III of the Civil Rights Division to Board attorney Frank Cicero (one of the steps in the negotiations that led to the Consent Decree), Days asked whether Board would be willing to include the following provision among others in a consent order (emphasis added):

> A statement that while *each party is obligated to search for every available means to provide adequate financial resources for the implementation of the desegregation plan* and while each party reserves the right to seek to add additional parties who may be legally obligated to contribute to the cost of desegregation, the parties recognize that financial cost of implementation is not a legally sufficient basis for postponement, cancellation or curtailment of the desegregation plan. . . .

That emphasized language was obviously the antecedent of Section 15.1, except that "search for" became "find and provide"—a broader obligation on the United States. Simply to read the emphasized clause compels recognition of the fact its stress was on a universal search—on "every"—and it is artificial to detach "available" from the rest of the clause as a *limiting* term.

**7.** Government Ex. 2 is a joint stipulation as to negotiations leading to the Consent Decree, an exhibit Board seeks to exclude from consideration. It states in part:

> At a relatively early stage in the negotiations leading to the Consent Decree, the parties discussed the question of financial support from the United States for the Board's desegregation activities. It was the Government's position that no funding commitment specific as to form and amount could be made in the context of the Consent Decree, because there was no way to anticipate the nature and costs of the Board's Plan, the amount and sources of Government funding, or a variety of other matters. . . . These discussions took place approximately two months before the completion and execution of the Consent Decree. It was concluded that the matter of federal financial support would be handled by including general provisions in the Con-

5. All terms of the Consent Decree, including Section 15.1, are entitled to particular respect because they embody the conditions upon which Board waived its right to litigate, a right guaranteed by the Due Process Clause of the Fourteenth Amendment. *Armour & Co.,* 402 U.S. at 682, 91 S.Ct. at 1757.

6. To date Board has fulfilled its obligations under the Consent Decree, particularly including Section 15.1. Despite such fulfillment of its obligations, Board cannot obtain "adequate" financing for full implementation of the Plan without receiving financial assistance from other sources, including the United States.

7. Under the Consent Decree Board is not required to exhaust all its available resources for implementation of the Plan before the United States becomes obligated to find and provide every available form of financial resources adequate for implementation of the Plan.

8. In all events the United States' promise to "make every good faith effort" to find and provide available funds entails a serious and substantial obligation. *Geisser v. United States,* 513 F.2d 862, 869–71 (5th Cir.1975), *on remand,* 414 F.Supp. 49 (S.D. Fla.1976), *appeal after remand,* 554 F.2d 698 (5th Cir.1977), *appeal after remand,* 627 F.2d 745 (5th Cir.1980), *cert. denied,* 450 U.S. 1031, 101 S.Ct. 1741, 68 L.Ed.2d 226 (1981). Having properly exercised its discretion by entry into the Consent Decree, *see Gautreaux v. Pierce,* 690 F.2d 616, 628–29, 637–38 (7th Cir.1982) the United States does not have discretion to violate it.

9. Under the plain language of the Consent Decree and under the circumstances described in Conclusion 4, the Executive Branch of the United States is unquestionably now obligated to take every affirmative step within its legal authority to find and provide adequate financing for the Plan. *Brewster v. Dukakis,* 675 F.2d 1 (1st Cir. 1982), *aff'g as modified decisions in* Civil Action No. 76–4423–F (D.Mass. Sept. 15, 1981; Dec. 23, 1981); *Ricci v. Okin,* 537 F.Supp. 817 (D.Mass.1982). That obligation includes the following efforts and actions, to the extent necessary to assure full implementation of the Plan:

(a) "provide" any presently available funds;

(b) "find" every available form of funds, by identifying excess or otherwise available appropriations for other purposes and

(1) notifying Congress of the intent to reprogram such funds when they are in the same budget account; or

(2) seeking congressional reappropriations of such funds from other budget accounts;

(c) "find" funds by supporting specific legislative initiatives to meet the obligations to Board;

(d) "find" funds by not failing to seek appropriations that could be used for desegregation assistance to Board, and by not attempting to rescind all such appropriations.

10. By taking actions to render financial assistance unavailable for the purposes specified in Section 15.1, the United States has violated its obligations under the Consent Decree. It has failed to make substantial efforts to find and provide financial assistance, and it must now do so. Funds have been available to the United States that would have been provided to Board had the United States employed "every good faith effort" as it was bound to do.

sent Decree, and Section 15.1 was drafted and incorporated into the Decree. Section 15.1 was not designed to incorporate any specific discussions between the parties on this issue, but to establish a general obligation on the part of both parties which would be interpreted and applied as appropriate in whatever future circumstances might arise. What the United States obviously fails to perceive is that its own position, and the manner Section 15.1 came into being, barred it from the kind of conduct it has engaged in to frustrate its own commitment. What this Court is in fact doing now is "interpret[ing] and apply[ing]" the "general obligation on the part of [the United States] ... as appropriate in [today's] circumstances...." Again the history it seeks to urge on this Court supports, rather than undermining, this Conclusion.

Such funds continue to be available at this time.

11. This Court has not had the opportunity in the limited time available for the hearings to verify the validity of all of the following. It appears however that the currently "available forms of financial resources" may include the following:

(a) Under ECIA the Secretary of Education is authorized to reserve up to 6% of the total amounts appropriated under the block grant provisions of ECIA, to carry out various programs, in his discretion. 20 U.S.C. §§ 3813, 3851. Of the $28,765,-000 million set aside for the Secretary's Discretionary Fund in fiscal year 1983, $10,725,000 must be used to fund the programs mandated by 20 U.S.C. § 3851(b). Other moneys in the Discretionary Fund may be used to provide desegregation assistance directly to local educational agencies. 20 U.S.C. §§ 3832(7), 3811, 3851(a)(2)–(4). Approximately $8,980,000 is currently available in the Discretionary Fund. It is within the Secretary's authority to establish priorities, and to give a competitive or absolute preference to applications which meet those priorities, for grants from the Discretionary Fund. 34 C.F.R. 75.105(c)(2), 75.105(c)(3). Nothing in the Education Department's General Administrative Regulations (EDGAR), which govern grants made out of the Secretary's Discretionary Fund, would prevent the Secretary from making an award to Board. 32 C.F.R. 75.210, 75.217. There are no statutory, regulatory or other legal provisions that prevent the Secretary from using the unobligated monies in the Discretionary Fund to provide financial assistance to Board for desegregation.

(b) There are no statutory, regulatory or other legal provisions that would preclude the Secretary of Education from awarding all or part of the $24 million currently available in the Title IV program fund to Board for the purposes set forth in 42 U.S.C. §§ 2000c–2 and 2000c–4. EDGAR provisions do not apply to grant awards under Title IV, which can

be made by the Secretary at any time. 34 C.F.R. 270.02(c), (e), 270.74(a).

(c) In addition to the foregoing items, the Secretary of Education may reprogram funds between programs within the same budget account by providing notice to the Chairmen of the two congressional appropriations committees. $28.058 million is currently available in programs other than Title IV, in the Special Projects and Populations account. Those funds could be reprogrammed to the Title IV program and made available to Board for desegregation assistance.

12. Funds distributed to Board pursuant to ECIA's block grant legislation do not fully satisfy the United States' obligations under the Consent Decree. Moreover the Secretary of Education has the authority to issue regulations relating to the approval of block grant distribution criteria submitted by the states and to consult with state and local officials regarding the distribution of block grant funds on his own initiative (20 U.S.C. § 3871(a)). Although the United States cannot itself "provide" the block grant funds, its "good faith effort" obligations under Section 15.1—in light of its past conduct—include the current exercise of its retained authority to encourage provision of block grant funds in a manner that takes into account Board's need for desegregation assistance.

13. Every citizen has a right to expect fair dealing from the government and must be able to have confidence in the integrity of the nation's officials. *S & E Contractors, Inc. v. United States,* 406 U.S. 1, 10, 92 S.Ct. 1411, 1417, 31 L.Ed.2d 658 (1972); *United States v. 119.67 Acres of Land,* 663 F.2d 1328, 1333–34, 1336 (5th Cir.1981). When government officials are involved, it is particularly important for this Court to insure compliance with its orders. *United States v. An Undetermined Quantity of An Article of Drug Labeled As Benylin Cough Syrup,* 583 F.2d 942, 949 (7th Cir.1978). As a judgment, a consent decree may be enforced by citation for contempt if it is violated. *City of Miami,* 664 F.2d at 440; *United States ex rel. Shell Oil Co. v.*

*Barco Corp.,* 430 F.2d 998, 1000 (8th Cir. 1970).

■ 14. What the government's arguments here seek to do is to modify the Consent Decree, though it denies that intention and charges Board with the same motive. Both parties agree the standard for modification of a consent decree is a strict one, and relief is granted only upon a showing of exceptional circumstances. *Fox v. United States Department of Housing and Urban Development,* 680 F.2d 315, 322 (3d Cir.1982); *Ricci,* 537 F.Supp. at 825 (D.Mass.1982). That strict standard applies with equal force to cases involving government officials. *Id.; Philadelphia Welfare Rights Organization v. Shapp,* 602 F.2d 1114, 1119–21 (3d Cir.1979) *cert. denied,* 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980) (both involving state officials).

■ 15. There are no circumstances advanced by either party justifying modification of the Consent Decree. Certainly conditions created by a party itself, such as the United States invokes here, are not grounds for modification. *Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania,* 678 F.2d 470, 476 (3d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 298, 74 L.Ed.2d 280 (1982); *Williston on Contracts* § 1959 (3d Ed.1978).

■ 16. To be entitled to preliminary injunctive relief, a plaintiff must show a reasonable likelihood of success on the merits, that irreparable harm will occur if the injunction does not issue, that the threatened injury to plaintiff outweighs the threatened harm to defendant, and that the grant of the injunction will not disserve the public interest. *Wesley-Jessen Division of Schering Corp. v. Bausch & Lomb, Inc.,* 698 F.2d 862, 864 (7th Cir.1983). Application of those principles to this case demonstrates Board has borne its burden on each of those criteria:

(a) There is a substantial likelihood Board will prevail on its Petition. There is substantial evidence the United States has violated its binding and enforceable obligations under the Consent Decree and

the disposition of the funds at issue would constitute a further violation.

(b) Board will be irreparably injured if the United States is not restrained from committing or expending further funds, because the Court will be effectively deprived of its power to grant the relief sought.

(c) Any hardship imposed on the United States from the grant of this injunction is not substantial. It certainly does not outweigh the injury to be inflicted upon Board if the injunction is not granted.

(d) Without question the public interest is best served by granting the injunction. In particular, the public interests in assuring full and adequate implementation of the Plan, in preserving the integrity of the Consent Decree and in protecting the dignity and power of this Court would be served.

Accordingly Board continues to satisfy all of the requirements for preliminary injunctive relief.

17. Considerations of comity dictate that the United States be given one final opportunity to comply with its obligations under the Consent Decree and that it receive definitive guidance from this Court. Given that fact and the nature of the relief granted by the Order entered contemporaneously with these Findings and Conclusions, coupled with Board's identity as a public body, this Court finds the unlikelihood of any damages to be incurred or suffered by any party who might be found to have been wrongfully enjoined or restrained justifies issuance of an injunction without the giving of security by Board.

### APPENDIX A

15.1 Each party is obligated to make every good faith effort to find and provide every available form of financial resources adequate for the implementation of the desegregation plan.

### ORDER

This Court has considered the Petition filed by the Board of Education of the City

of Chicago ("Board") and its Motion for Declaratory and Injunctive Relief, the full record in this litigation to date, and the hearings held and evidence received on June 1, 7, 8, 22 and 27, 1983. In accordance with and in implementation of the Findings of Fact and Conclusions of Law entered by this Court contemporaneously with this Order,[1] it is hereby ORDERED, ADJUDGED AND DECREED:

1. This Court declares the liability, rights and obligations of the parties as follows:

(a) This Court's September 24, 1980 Consent Decree, and particularly Section 15.1, is a binding and enforceable obligation of the United States, its agencies and officers, both as a settlement agreement among the parties and as an order of this Court.

(b) Under Section 15.1 the Executive Branch of the United States is now required to take every affirmative step within its legal authority to seek to "find and provide" desegregation funding to Board, until funding adequate for full implementation of the Plan has been provided.

(c) More specifically, the obligation of the United States pursuant to Section 15.1 requires that the Executive Branch take the following affirmative steps:

(1) identify all funds that are currently appropriated and can be used to provide desegregation assistance to Board without any further congressional action;

(2) identify all funds that are currently appropriated for purposes other than desegregation assistance to local educational agencies but that are within the same budget account as desegregation assistance funds, so they could be provided to Board by giving notice to Congress that the funds are being reprogrammed, but without any congressional action;

(3) identify all "excess" funds currently appropriated for budget accounts that do not include desegregation assistance in the Department of Education or any other agency that has authority to provide financial desegregation assistance, but that could be reallocated through congressional action to budget accounts allowing desegregation assistance;[2]

(4) identify any available legislative initiatives to the extent that such initiatives would provide financial desegregation assistance specifically to Board;

(5) to the extent funds are or become available, provide financial desegregation assistance to Board in an amount that, together with funds provided from Board and other sources, is adequate for full implementation of the Plan;[3]

(6) cooperate with Board so as to fulfill any administrative requirements, and remove any administrative obstacles, that bear upon providing general support for the Plan; and

(7) take any steps available within its lawful authority to promote the use of funds provided to the State of Illinois under ECIA for desegregation assistance to Board.

(d) Funds are currently available in the Discretionary Fund and in the Special Programs and Populations Fund, in amounts exceeding $15 million, that could be provided by the Secretary of Education to Board for desegregation assistance.

(e) Because the United States has failed to provide formerly and presently available desegregation funding to Board, has taken virtually no affirmative steps to find and

---

1. All terms defined in the Findings and Conclusions shall have the same meaning when used in this Order.

2. "Excess" funds include any allocated funds the agency has determined it will not expend for the purpose for which they were appropriated, but instead will seek to rescind, allow to lapse or seek to reallocate to other budget accounts.

3. If several sources of funds that are available to draw upon are more than adequate in the aggregate for full implementation, it is within the discretion of the United States to determine which of those sources to draw upon: funds identified under Subparagraph 1(c)(1), or funds obtained through reprogramming, reappropriation or new legislation pursuant to the possibilities identified under Subparagraphs 1(c)(2) through 1(c)(4), or funds obtained from any other possible source.

provide such funding and has indeed taken affirmative steps to minimize and eliminate available sources of such funding, the United States has violated and continues to violate the agreement between the parties and the order of this Court embodied in the Consent Decree.

(f) Under the Consent Decree the obligations of the United States concerning funding extend for a five-year period. Because the United States has not effectively begun to meet its funding obligations before now, that five-year period shall begin with school year 1983–84 rather than when the Plan was first implemented.

(g) For purposes of Section 15.1 and of Subparagraph 1(c)(5) of this Order, the amount of funding adequate for full implementation of the Plan on an annual basis includes the following:

(1) $56.9 million in incremental desegregation expenditures budgeted by Board for school year 1982–83;

(2) $14.6 million, which is the amount of additional incremental expenditures required by Board to achieve the necessary threshold level of funding for Educational Components in predominantly minority schools, as identified by Board in Part II of the Plan (filed April 29, 1981);[4] and

(3) such additional amounts as may hereafter be determined by this Court, pursuant to Board's contentions described in Subparagraph 1(h) of this Order.[5]

(h) Board contends the following additional amounts are necessary for adequate full implementation of the Plan:

(1) expenditures for ongoing Board resources that have been wholly or substantially devoted to, or redirected for the purpose of, implementing the Plan (such as in the reassessment of all EMH students in the school system);[6]

(2) approximately $163 million over the next five to seven years for improving the physical conditions in predominantly minority schools to ensure a safe, clean and attractive environment in all such schools;

(3) amounts necessary to implement new desegregation measures adopted in Board's 1983 Annual Desegregation Review, including two new magnet schools, certain magnet and specialty programs, and measures to relieve over-capacity enrollments in predominantly minority schools; and

(4) amounts necessary for educational remedies in predominantly minority schools and integrated/desegregated schools, such as staff development at all levels, implementation of the Effective Schools Program, a summer school program for students achieving substantially below grade level and other programs.

(i) Both the Plan and the further evidence presented to this Court indicate Board is making every good faith effort to find and provide funding adequate for full implementation of the Plan. Nonetheless Board does not have resources adequate for the full implementation of the Plan, and in particular does not have the $14.6 million described in Subparagraph 1(g)(2).

(j) This Court recognizes the costs of the Plan must be borne by Board and the United States (and potentially third parties) in amounts or proportions yet to be finally determined. That determination will depend upon various factors, including the total funding adequate for full implementation of the Plan and the resources that can be provided by Board, the United States and other parties. At this time the amount to be borne by the United States is, at a minimum, the portion of funding adequate for full implementation of the Plan that

---

4. This amount includes the $10 million in additional incremental desegregation expenditures budgeted by the Board for school year 1983–84.

5. This provision does not constitute a determination as to the validity or invalidity of those contentions, a subject that remains for future determination by this Court.

6. Expenditures devoted to the EMH aspect of such desegregation implementation was $4.6 million in school year 1982–83 and will be the same amount in 1983–84.

Board cannot provide, to the extent such funding is available to, or can be made available by, the United States.

(k) At this stage, considering the minimum level of funding for full Plan implementation that will be adequate for school year 1983–84, the amount of funds available (and potentially available) to the United States and Board, the levels of funding previously provided by the United States to desegregating school boards, and an equitable allocation of costs among the parties, this Court determines the obligation of the United States for funding the Plan in school year 1983–84 is not less than $14.6 million. Further obligations of the United States for such funding in school year 1983–84 will be determined after a further hearing concerning Board's contentions described in Subparagraph 1(h) and after the United States has reported to this Court pursuant to Paragraph 2 as to the amount of funds available.

2. For the reasons stated in Paragraph 1, the United States is directed to undertake immediately an active and affirmative program of making every good faith effort to find and provide for school year 1983–84(a) the $14.6 million referred to in Subparagraph 1(k) and (b) such further level of funding as may be determined by this Court. As n. 3 reflects, the particular form and details of the affirmative program, as well as the ultimate sources of the funding, are within the discretion of the United States, except that the program shall include the elements described below. On or before July 11, 1983 the United States is directed to formulate and submit to this Court the form and details of the affirmative program, with a clear designation of the persons responsible for leading and coordinating the program. It shall seek to implement that program within four weeks thereafter and shall submit weekly reports to this Court detailing its efforts and progress, the final report being due August 8, 1983. That affirmative program shall be designed to meet the obligations of the United States as defined in Paragraph 1 and shall specifically include each of the following efforts, to the extent necessary to meet those obligations:

(a) efforts to provide to Board the $8.98 million that remains unobligated and available for local desegregation assistance in the Secretary of Education's Discretionary Fund;

(b) efforts to provide to the Board the $52.058 million that remains unobligated and available for local desegregation assistance in the Department of Education's Special Programs and Populations Fund;

(c) efforts to secure congressional consent for the reallocation of excess funds from the Department of Education's Guaranteed Student Loan Program into the Secretary's Discretionary Fund or another fund from which general support may be provided for implementation of the Plan;

(d) efforts to identify other available monies, or to reprogram or reallocate other excess monies, so that such funds may be provided as general support for the Plan;

(e) support of legislative initiatives that would provide desegregation funding to school districts that have entered into Consent Decrees that have been construed by courts to require efforts to provide such funding by the United States;

(f) efforts to eliminate any potential conflict between the obligations of the United States to Board and the Secretary of Education's intention to aid the grantees and projects that the Department of Education had contemplated funding from the Discretionary Fund and the Special Programs and Populations Fund, by attempting to fund such other grantees and projects from other sources; and

(g) cooperation with Board to identify all aspects of Board's desegregation activities that are or could be eligible for funding under Title IV.

That affirmative program, because it is the responsibility of the United States, shall not be limited to the Department of Education, but shall also include the Department of Justice, the Office of Management and Budget, and any other personnel or agencies of the United States whose participation is necessary for the program to be successful.

3. While the United States is carrying out its obligations to Board for school year 1983–84 as provided in Paragraph 2, it is necessary to protect Board against the obligation or expenditure by the United States of monies available for providing desegregation funding to Board. Accordingly this Court's June 8, 1983 Order preserving the status quo is further extended and modified as follows:

(a) Until August 10, 1983 the United States and its agent the Secretary of Education are directed to refrain from expending, or taking any further action to obligate in any way, funds appropriated by Congress for the Secretary of Education's Discretionary Fund for fiscal years 1983 and 1984, and for certain other programs [7] in the Department of Education's Special Programs and Populations Account for fiscal year 1983 and 1984, except as provided in the following subparagraphs.

(b) This Order does not apply to the $10.725 million appropriated to the Discretionary Fund for fiscal year 1983 that is mandated by Congress, pursuant to 20 U.S.C. § 3851(b), to be expended for three specific programs, or to fiscal year 1984 funds the use of which is similarly mandated by Congress.

(c) This Order does not apply to unobligated Discretionary Funds in the amount of $50,000 that were exempted from the June 8 Order.

(d) This Order does not apply to Discretionary Funds in the amount of $9.059 million that were obligated by the Department of Education prior to the close of business on June 8, 1983, consisting of $7.687 million for the National Diffusion Network and $1.364 million for technology continuations, secondary school recognition and the National Commission on Excellence in Education.

(e) Funds in the five programs listed in n. 7 may be obligated and expended by the Secretary of Education in amounts that are necessary to enable all intended fiscal year 1983 grantees in those programs to operate at present levels up to August 15, 1983. No funds restrained by this Order may be obligated or expended for operations after August 15, and the Secretary of Education shall insure that the provision of funds until August 15 is accomplished so that it does not give rise to an obligation or claim for future funding. All such grantees shall first be required to extend their fiscal year 1982 projects (if any) to the extent that they have funds remaining for that purpose.[8] In the aggregate the amounts obligated and expended by the Secretary of Education pursuant to this subparagraph shall not exceed 11.5% of the fiscal year 1983 appropriation for the Special Programs and Populations Fund, which is $5.989 million.

4. There are various funds appropriated to the Department of Education for purposes other than desegregation, including the Guaranteed Student Loan Fund, that (a) are in excess of the amounts that are or will be needed for those purposes in this fiscal year and (b) potentially can be used by the United States to fulfill its obligations under the Consent Decree for school year 1983–84 and the following four years of implementation of the Board's Plan. To ensure to the greatest extent possible that such excess funds are not disposed of or otherwise rendered unavailable, the Executive Branch of the United States is directed to undertake an affirmative program to preserve the availability of such excess funds in the amount of $250 million. Both the form and details of that affirmative program shall be determined by the Executive Branch in its discretion except in the following respects (which shall be part of the program in any event):

7. Title IV, Women's Educational Equity, Follow-Through, Aid to the Virgin Islands and Territorial Teacher Training.

8. By August 1 the United States shall submit a written report to the Court documenting that the amount provided to each grantee was reduced by the amount the grantee estimated would remain unexpended from its fiscal year 1982 grant under that program. Such amounts of remaining fiscal year 1982 funds shall be verified by the Department of Education from the final reports submitted by such grantees on or about September 30, 1983.

(a) withdrawal of any pending proposal for the rescission by Congress of the appropriations for the excess funds, to the extent of $250 million;

(b) affirmative efforts by the Executive Branch to preserve the availability of excess funds in that amount; and

(c) such actions and legislative initiatives by the Executive Branch as are appropriate to set aside $250 million of excess funds in a reserve or escrow fund earmarked for potential use for fulfillment of the United States' obligations under the Consent Decree during the next five-year period.[9]

5. For the reasons stated in Conclusion 17, this preliminary injunction order is issued without Board's giving of security.

6. These proceedings are scheduled for further hearing at 2 p.m. August 10, 1983, for further consideration of the level of funding adequate for full implementation of the Plan, and other matters as appropriate.

See also D.C., 554 F.Supp. 912, D.C. 567 F.Supp. 272.

---

**9.** This Court will enter a further order concerning the terms and conditions of the escrow fund after further facts have been supplied it in that respect.