UNITED STATES of America,
Plaintiff-Appellant,

v.

BOARD OF EDUCATION OF the CITY
OF CHICAGO, Defendant-Appellee.

No. 84–2405.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 6, 1984.

Decided Sept. 26, 1984.

Rehearing Denied Nov. 30, 1984.

William B. Reynolds, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Robert C. Howard, Hartunian, Futterman & Howard, Chtd., Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, and WOOD and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

This case comes before us for the second time on appeal from an order of the district court interpreting and enforcing a consent decree that was executed by the United States and the Board of Education of Chicago ("Board"). For the reasons set forth below, we vacate the order and remand this case for an evidentiary hearing.

## I. FACTS

### A. Events Prior to the First Appeal

As we explained in our first opinion, *see United States v. Board of Education of Chicago*, 717 F.2d 378 (7th Cir.1983), this case arises from a complaint that the United States filed against the Board on September 24, 1980, charging that Chicago's public school system was racially segregated in violation of the fourteenth amendment and titles IV and VI of the Civil Rights Act of 1964. On the same day, the parties filed a previously-negotiated consent decree ("Decree") in which they agreed that the Board would develop and implement a system-wide plan to remedy the effects of past segregation on black and Hispanic students in Chicago schools. Beginning in 1981, the Board developed and implemented a desegregation plan, which was later approved by the district court. *See United States v. Board of Edu-*

*cation of Chicago*, 554 F.Supp. 912 (N.D. Ill.1983).

On May 31, 1983, the Board petitioned for an order directing the United States to comply with ¶ 15.1 of the Decree, which provides that

[e]ach party is obligated to make every good faith effort to find and provide every available form of financial resources adequate for the implementation of the desegregation plan.

After five days of hearings, the district court entered an order on June 30, 1983 ("1983 Order"), finding that the United States had violated ¶ 15.1 by failing to provide adequate desegregation funding, by taking no affirmative steps to find and provide such funding, and by taking affirmative steps to minimize and eliminate available sources of funding. *See United States v. Board of Education of Chicago*, 567 F.Supp. 272, 286–87 (N.D.Ill.1983). The court held that under the plain meaning of ¶ 15.1, and also because the government actively worked to make funds unavailable, the United States was "obligated to take every affirmative step within its legal authority to find and provide adequate financing for the plan." *Id.* at 283 (Conclusion of Law No. 7). According to the district court, this obligation required the United States to provide presently available funds, to find every available source of funds, to support specific legislative initiatives to meet the obligations of the Board, and "not [to] fail[ ] to seek appropriations that could be used for desegregation assistance to the Board." *Id.* (Conclusion of Law No. 9). The court decided that, at a minimum, the United States was to provide the portion of funding adequate for full implementation of the desegregation plan that the Board could not provide, to the extent such funding was available to or could be made available by the United States. *Id.* at 287–88. For the 1983–84 school year, the district court found that this obligation was not less than $14.6 million, and the court enjoined the United States from spending or obligating certain funds in several of the Department of Education's monetary accounts so as to

insure that these funds would remain available pending the final resolution of the case.

## B. The First Appeal

The United States appealed the 1983 Order, arguing that ¶ 15.1 merely required it to make a good faith effort to assist the Board in locating and applying for funds that had been earmarked by Congress for school districts undergoing desegregation. In an opinion issued on September 9, 1983, this court rejected the government's argument; we interpreted ¶ 15.1 as requiring the United States to do more than assist the Board in locating and applying for federal funds and as imposing "a substantial obligation on the government to provide available funds to the Board." *United States v. Board of Education of Chicago*, 717 F.2d at 383.[1]

After considering the findings and conclusions of the district court, we refused to decide whether the United States violated ¶ 15.1 of the Decree by taking such policy-oriented steps as requesting Congress to reduce or rescind appropriations for certain programs, supporting legislation that replaced direct grant programs with federal block grants, and supporting the dismantling of the Department of Education. Instead, we held that the United States violated ¶ 15.1 by failing to provide available funds to the Board, and we specifically referred to funds from the Department of Education's Title IV account and Discretionary Fund. *Id.* & n. 8.

With regard to the issue of remedies, this court found that "the district court acted with excessive dispatch in delineating specific remedies immediately after finding a violation of ¶ 15.1." *Id.* at 384. We held that "the district court should provide the Department [of Education] an opportunity to fashion its proposed remedy for past noncompliance, as well as a chance to show that it intends to comply in the future,

before structuring detailed remedial action that may still be necessary." *Id.* at 385. Accordingly, we vacated all remedies, affirmed the temporary injunction against government use of certain funds so as to preserve the status quo, and remanded the case to the district court.

## C. Events Subsequent to the First Appeal

### 1. *Congressional Activities*

On September 21, 1983, United States Representative Sydney Yates proposed the following legislation:

> There is hereby appropriated $20,000,000 to be derived by transfer from funds available for obligation in fiscal year 1983 in the appropriation for "Guaranteed Student Loans," to remain available for obligation until September 30, 1984, to enable the Secretary of Education to comply with the Consent Decree entered in United States District Court in the case of the United States of America against the Board of Education for the City of Chicago (80 C 5124) on September 24, 1980.

This provision ("the Yates Bill") was incorporated by Congress into H.J. Res. 368, a continuing resolution to provide temporary funding for several federal departments in fiscal year 1984. The President signed H.J. Res. 368 into law on October 1, 1983. Three days later, on October 4, United States Senator Lowell Weicker proposed an amendment to the Yates Bill ("the Weicker Amendment"), which was adopted by Congress on October 31, 1983, in the following form:

> No funds appropriated in any act to the Department of Education for fiscal years 1983 and 1984 shall be withheld from distribution to grantees because of the provision of the order entered by U.S. District Court for Northern District of Illinois on June 30, 1983: Provided, that the Court's decree entered on September

---

1. In reaching this interpretation, we specifically upheld both Conclusion of Law No. 8 of the 1983 Order ("the United States' promise [under ¶ 15.1] entails a serious and substantial obligation") and the district court's finding, expressed during the June 1983 hearings, that ¶ 15.1 embraces the grant of funds, not just technical assistance in applying for funds (Transcript of June 8, 1983, at 23). *See United States v. Board of Education of Chicago*, 717 F.2d at 381–83.

24, 1980 shall remain in full force and effect.

In response to a motion that the Board submitted after the enactment of the Yates Bill, the district court ruled, on October 5, that as soon as the Secretary of Education obligated to the Board the $20 million allocated by the Yates Bill, the government would be permitted to use $15.66 million in the Department of Education accounts that remained temporarily frozen. On the same day, the United States moved the district court to vacate its 1983 Order and to declare that the $20 million allocated to the Board under the Yates Bill brought the United States into compliance with the Decree. The government renewed this motion on November 10, arguing that in light of the Yates Bill and the Weicker Amendment, no funds beyond the appropriated $20 million were available to the Board for fiscal years 1983 and 1984. The district court denied the government's motion on November 21, 1983.

### 2. Activities on Remand

At a status hearing on October 5, 1983, the district court decided that an evidentiary hearing, which originally had been scheduled for August 10, 1983, was still needed to determine the level of funding that the Board required in order to implement its desegregation plan. See Transcript of October 5, 1983, at 13–14. The government contended that the hearing exceeded our remand instructions to the extent that the hearing was to establish the Board's needs and the government's obligations beyond the $20 million allocated by the Yates Bill. See id. at 23; United States' Pre-Trial Brief on Remand Proceeding, dated March 13, 1984. From October 1983 to March 1984, the parties submitted numerous filings in preparation for the hearing, which began on March 23, 1984, and continued for nine days. Witnesses for the Board testified about the programs that the Board had developed under its desegregation plan, the costs of these programs, and the sources of program funding. In addition, the Board presented evidence of lobbying activity undertaken by the Executive Branch with regard to the Yates Bill and the Weicker Amendment. The United States called only one witness, who discussed the use of federal Title I funds for desegregation expenses.

On June 8, 1984, the district court issued an extensive opinion ("1984 Opinion") in which it reviewed the evidence presented during the hearing. 588 F.Supp. 132. The court found from this evidence that most of the programs under the Board's desegregation plan materially aid the successful implementation of the plan and that the costs of these programs are reasonable under the circumstances. See 1984 Findings of Fact Nos. 210–59. Furthermore, the court found that the level of funding adequate for full implementation of the desegregation plan in the 1984–85 school year is approximately $171.631 million. 1984 Finding of Fact No. 265. Of this amount, the court determined that the Board will not be able to fund $103.858 million, despite the Board's best efforts to do so. Incorporating its 1983 ruling that ¶ 15.1 requires the United States to provide the portion of funding adequate for full implementation of the desegregation plan that the Board cannot provide, see 1984 Conclusions of Law Nos. 6–8, the district court decided that the "share ... the United States is obligated to make every good faith effort to find and provide pursuant to [¶] 15.1 is $103.858 million." 1984 Conclusion of Law No. 38.

Addressing the actions of the United States since the issuance of the 1983 Order, the district court found that the government acted in bad faith by failing to provide funds to the Board, by failing to request congressional appropriations for the Board, by deciding not to reprogram available funds for use by the Board, by deciding not to provide direct grants to local educational agencies for purposes of desegregation, by attempting to make funds unavailable through congressional lobbying efforts during passage of the Yates Bill and the Weicker Amendment, by redrafting administrative regulations regarding the Secretary of Education's Discretionary Fund,

and by submitting a plan for supporting the Board's desegregation efforts which, according to the court, "contained no adequate suggestions ... for providing further funding." *See* 1984 Conclusions of Law Nos. 120–21, 123–26. The court ruled that, viewed either alone or in the circumstances of the government's bad faith, "[¶] 15.1 (as a matter of construction) requires the Executive Branch promptly to undertake some combination of ... lobbying activities to the extent necessary to assure financing adequate for implementation of the [desegregation] [p]lan." 1984 Conclusion of Law No. 142. Such activities include requesting appropriations from Congress and opposing contrary legislative initiatives.

After allowing the United States time to respond to its opinion, the district court issued an order on August 13, 1984 ("1984 Remedial Order"), declaring that, "in light of the [ ] present circumstances, the United States has an unconditional obligation to provide Board with $103.858 million for implementation of the [desegregation] [p]lan in school year 1984–85." 1984 Remedial Order at 9. The court further ordered that, in the event the United States failed to provide the funds by August 22, 1984, the United States was permanently enjoined to take all necessary steps to obligate for the use of the Board $17 million in the 1984 Discretionary Fund and $11.775 million in the 1984 Title IV account. *Id.* at 11–12. Furthermore, the court declared that the United States must formulate an affirmative program each year to assure that up to $103.858 million is placed in an escrow account. Such a program would consist of the identification of available funds, recommendations to Congress, and lobbying activities. *Id.* at 12–15.

The government now appeals the district court's 1984 Opinion and 1984 Remedial Order, and it advances two arguments. First, the United States contends that the district court erred in interpreting ¶ 15.1 as requiring the Executive Branch to engage in legislative activity, to make up the difference between the funds necessary for implementing the desegregation plan and the funds that the Board has budgeted for this purpose, and to award Title IV funds and Discretionary Funds to the Board without regard to other grantees. Second, the government maintains that if the district court's interpretation of ¶ 15.1 is correct, the Decree is unenforceable because it violates the constitutional doctrine of separation of powers. According to the government, the Executive Branch does not have the authority to bargain away its discretion with respect to its legislative activities or to commit unlimited financial assistance to only one grantee, in contravention of the legislative purpose of the desegregation funding statutes.

## II. ANALYSIS

As both parties and the district court have acknowledged, ¶ 15.1 is a unique funding provision in a consent decree that constitutes an unprecedented settlement of a school desegregation claim by the United States. Mindful of the novelty of the agreement, we carefully crafted our prior opinion so as to permit the maximum amount of flexibility and cooperation among the participants in the Decree as they labored toward a workable resolution of the dispute regarding funds for Chicago school desegregation. Our review of the events that transpired on remand convinces us that the process of dispute resolution has failed remarkably in this case.

### A. Interpretation of ¶ 15.1

As we recounted above, our prior opinion interpreted ¶ 15.1 as "impos[ing] a substantial obligation on the government to provide available funds to the Board." *United States v. Board of Education of Chicago*, 717 F.2d at 383. Since the United States had misinterpreted ¶ 15.1 as merely requiring that the government assist the Board in filing applications for federal aid, and since it had failed to provide available funds to the Board, we remanded the case to the district court to give the government an opportunity to show that it intended to

comply with ¶ 15.1 in the future.[2] On November 10, 1983, the government submitted the "Plan of the United States for Supporting the Desegregation Plan of the Board of Education of the City of Chicago" ("November 10 Plan"), in which it outlined its position, later rejected by the district court, that the Weicker Amendment had rendered unavailable to the Board any 1984 funds beyond the $20 million allocated by the Yates Bill.[3] However, in the November 10 Plan, the government also stated for the first time that it was prepared to give the Board priority in the distribution of desegregation funds under existing federal programs.[4] The district court gave little weight to the November 10 Plan. In its 1984 Opinion, the court stated that the plan "contained no adequate suggestions at all for remedying the United States' past Consent Decree violations or for providing further funding for the [desegregation] [p]lan." 1984 Conclusion of Law No. 123.[5]

During the most recent oral arguments before this court, counsel for the government answered questions regarding the government's system of "priority" and explained that, under this system, the Department of Education will put the Board "at the top of the list" for any program grants that can be applied to desegregation assistance and for which the Board is eligible. According to the government's counsel, "top of the list priority" for Title IV funds not only is a guarantee that the Board will receive its "equitable fair share" of funding under Title IV criteria, but also requires that this funding be earmarked for Chicago and be set apart from the usual block grant funding that is allocated to the regional desegregation centers serving the Midwest. Furthermore, the government's counsel explained that, with regard to the Discretionary Fund, "top of the list" priority means that if the Board were to submit a research or development project that would aid its desegregation efforts, the Board would have priority "to get what the project called for."[6]

■ After considering the government's oral explanation of this priority system, especially the government counsel's assurance that this priority is not available to any other school district in the country, we conclude that by guaranteeing that the Board will be funded on a priority basis under existing school desegregation programs, the amount of which funding is determined by program criteria and is sub-

---

**2.** Since we noted a discrepancy in the district court's 1983 Order as to whether funds in the Title IV account and in the Discretionary Fund were available for use by the Board, we directed the district court on remand to verify the availability of these funds. *United States v. Board of Education of Chicago,* 717 F.2d at 383 n. 8. In another footnote, we instructed the district court to make known its findings of fact regarding the $14.6 million that it had determined was "'the amount of additional incremental expenditures required by Board to achieve the necessary threshold level of funding for Educational Components in predominately minority schools.'" *Id.* at 380 n. 2. Both of these district court tasks were necessary for clarification of the record and were to be carried out within the context of our carefully expressed instruction that the district court afford the government an opportunity to propose the means by which it would attempt to comply with ¶ 15.1.

**3.** The government has wisely abandoned this position in its argument to this court.

**4.** Prior to its submission of the November 10 Plan, the United States had insisted that ¶ 15.1 did not entitle the Board to any priority consideration in the Department of Education's allocation of desegregation funds. *See* Memorandum in Support of the United States' Motion For a Stay Pending Appeal, filed July 19, 1983, at 29.

**5.** Indeed, the district court concluded that by submitting the November 10 Plan, the government "willfully and in bad faith" violated the district court's October 28 order directing the United States to draft a plan for its compliance with ¶ 15.1.

**6.** We understand, from this explanation, that "top of the list priority" would preclude the situation that occurred in 1983, where the Board was denied Discretionary Funds because its two proposed projects were ranked thirteenth and twenty-eighth, and only the top ten projects received funding. *See* United States' Answers and Objections to Chicago Board of Education's Second and Third Set of Interrogatories, at 8–9 (filed with Board's Motion to Compel dated November 17, 1983).

ject to the review of the district court,[7] the government would comply with our interpretation of ¶ 15.1 and would fulfill its "substantial obligation to provide available funds."

■ By so ruling, we reject the district court's conclusion that ¶ 15.1 mandates that the government attempt to make funds available through legislative activity so as to provide the portion of necessary funding that the Board cannot supply. The district court had reached this conclusion in its 1983 Order and had relied upon it in conducting the March 1984 hearings, which established the level of funding needed to implement the Board's desegregation plan. In its 1984 Opinion, the district court noted that since we had not rejected its 1983 conclusion regarding the government's obligation,[8] that conclusion became the law of the case. 1984 Conclusions of Law Nos. 6–8. However, the district court also observed that it was not barred from reconsidering its 1983 conclusions, and it explained that the refusal to reconsider previously decided principles on remand is "a self-imposed (hence non-binding) prudential limitation." 1984 Conclusion of Law No. 1(a). In light of the strong indication in our prior opinion that a government's attempts to remedy its noncompliance with a consent decree are to be preferred over judicially-imposed remedies, the district court would have acted with optimal prudence if it had not inferred that our silence regarding its 1983 conclusions indicated validation, see 1984 Conclusion of Law No. 6, and if it had freshly reassessed, prior to the submission of the November 10 Plan, its interpretation that ¶ 15.1 requires the government to engage in legislative activities to make available the necessary desegregation funding that the Board cannot supply. Such a reassessment was appro-

priate despite the exhaustive work already undertaken by the district court and the understandable frustration that attended the judicial monitoring of the Decree.

After closely examining the extrinsic evidence surrounding the adoption of ¶ 15.1 into the Decree, we must conclude that there is inadequate support for the district court's interpretation. In the parties' stipulation regarding the negotiations leading to the adoption of ¶ 15.1, we find no indication that the parties had any federal funding sources in mind other than programs that could be used, consistent with the intent of Congress, to fund school desegregation efforts. To the extent that the district court reads the June 19, 1980, letter from Assistant Attorney General Drew Days to the Board as indicating that the parties contemplated legislative initiatives on the part of the Executive Branch to make funds available, see 1984 Conclusion of Law No. 139, we find this reading to be clearly erroneous. The applicable wording in this letter tracks the language in ¶ 15.1 and does not amplify or further explain the parties' intent.

■ We thus remand this case for a determination of whether the Board is receiving the maximum level of funding that is available under the criteria of programs through which funds for desegregation can be disbursed. In the likely event that the Board has financial needs that are still unmet, we note that the government has admitted that it has a "duty to search among funds that Congress had indeed made ... available." Transcript of April 5, 1984, at 1416. The best proof that the government is fulfilling this duty would be the assignment of personnel to the task of periodically reviewing federal funding programs, in the Department of Education and in other federal agencies, for unencum-

---

7. Counsel for the government acknowledged at oral argument that ¶ 15.1 binds the Secretary of Education's discretion with respect to the funds that may be used for school desegregation pursuant to congressional appropriation, and he conceded that a district court may review the Secretary's exercise of discretion in distributing those funds to the Board.

8. Given the narrow holding in our prior opinion that the government violated ¶ 15.1 by failing to provide available funds, we had no need to decide whether ¶ 15.1 obligated the government to engage in activities to make funds available in order to provide the amount needed to implement the plan.

bered funds that may be used to advance the Board's desegregation plan.

### B. Bad Faith

■ The district court relied on its finding of governmental bad faith, in addition to its interpretation of ¶ 15.1, as support for its 1984 remedial ruling that the United States had an unconditional obligation to provide $103.858 million to the Board for the 1984–85 school year. In light of our holding that ¶ 15.1 does not require the government to engage in legislative activities in order to make desegregation funds available, we find that the district court erred in concluding that the government acted in bad faith by failing to request congressional appropriations for the Board, and by deciding not to reprogram funds for use by the Board.[9] Furthermore, we find erroneous the district court's determination of bad faith in the government's decision not to provide direct grants for school desegregation. This policy decision applies to all school districts and does not indicate intent on the part of the United States specifically to avoid its obligation under ¶ 15.1.[10]

In its most significant finding of bad faith, the district court described lobbying activities of the Executive Branch during the passage of the Yates Bill and the Weicker Amendment. According to the findings of the district court, *see* 1984 Findings of Fact Nos. 504–17, the Executive Branch supported a proposed addition to the Yates Bill that specifically would have made unavailable to the Board the funds that had been restrained by the district court. Although this proposed provision was not adopted by the House of Representatives, the Executive Branch continued to lobby for specific language in the Yates

Bill to make the restrained funds unavailable to the Board. Even after the Yates Bill was signed into law without the desired language, the Executive Branch worked toward the inclusion of such language in the Weicker Amendment. On October 5, 1983, prior to the passage of the Weicker Amendment, the United States appeared before the district court and argued that very recent legislative history surrounding the yet-unenacted Weicker Amendment indicated that no funds other than the $20 million allocated by the Yates Bill were available to the Board and that, as a result, the court's 1983 Order should be dismissed. *See* Transcript of October 5, 1983, at 31–33. Although the Executive Branch continued to lobby for language in the Weicker Amendment to make funds unavailable to the Board, the amendment ultimately was enacted without this language.

The United States consistently has maintained that its legislative activities are unreviewable by the judiciary, thus prompting the Board to complain that the government's Yates-Weicker lobbying efforts were designed to force a constitutional issue upon the courts. Transcript of March 20, 1984, at 36–37. We need not reach any conclusion regarding the Yates-Weicker legislative activities, for we find that, even if these activities constituted bad faith violations of the Decree, the district court abused its discretion by ordering a $103.858 million monetary remedy against the government. Given the clear factual and procedural background of this case, it should have been apparent to the district court that if the government were compelled to pay this judgment for its bad faith, no federal desegregation money would have been available (or would have been made available) to other school dis-

---

9. As described by the district court, it is the Secretary of Education's policy to seek the approval of congressional leaders before effecting any reprograming of funds. 1984 Finding of Fact No. 427. Since this policy applies to all reprograming of funds, we cannot view it as an attempt to evade the government's obligations under the Decree.

10. Similarly, we must overrule the district court's finding that the government's redrafting of administrative regulations limiting grants of Discretionary Funds constitutes bad faith. These regulations embody general policy decisions applicable to all grantees, and we thus cannot conclude that they were drafted specifically to avoid the government's obligations under ¶ 15.1.

tricts. Such a result would have been unreasonable.

■ The proper remedy for any bad faith violations of the Decree in connection with the Yates-Weicker activities would have been a civil contempt citation under which the district court could have ordered the government either to refrain from specific efforts to make desegregation funds unavailable to the Board or to inform Congress about the funding obligations of the government under the Decree.[11] *Cf. Nelson v. Steiner*, 279 F.2d 944, 948 (7th Cir. 1960) (district court did not abuse discretion in holding state official in civil contempt, since "[t]he executive branch of government has no right to treat with impunity the valid orders of the judicial branch"). Since the time for such a remedial measure has passed, we do not decide whether the Executive Branch's Yates-Weicker legislative activities constituted bad faith violations of the Decree.[12]

In the circumstances of this case, we deem it important to note that the actions of the Executive Branch described above and reflected in the hearings below could be interpreted to contravene the spirit of the Decree. Such actions, while perhaps within constitutional limits, cannot enhance

the respect to which this Decree is entitled and do not befit a signatory of the stature of the United States Department of Justice. The Executive Branch initiated this critical litigation and bears a continuing shared and special responsibility for its eventual outcome, regardless of changes in personnel and ideology that will inevitably accompany the passage of time.

## III. CONCLUSION

Accordingly, we vacate the district court's 1984 Opinion and 1984 Remedial Order, and we remand this case for proceedings consistent with part II(A) of this decision. Circuit Rule 18 shall apply on remand.

---

11. If the district court had entered such a contempt order and the government then persisted in its efforts to make funds unavailable, criminal contempt charges might have been appropriate. *See United States v. Joyce*, 498 F.2d 592, 596 (7th Cir.1974) (willful and contumacious resistance to a court order is necessary to support a criminal contempt charge).

12. As an additional ground for its finding of bad faith, the district court cited the government's submission to Congress of § 309 of the President's proposed budget of the Department of Education (Board Exhibit No. 57):

No funds appropriated in any Act to the Department of Education for fiscal years 1984 and 1985 other than those appropriated by section 111 of Public Law 98–107 shall be available to fund the consent decree between the United States and the Board of Education of the City of Chicago: Provided, That the court's decree entered on September 24, 1980, shall remain in full force and effect and nothing in this provision shall be construed to preclude the Board of Education of the City of Chicago from receiving Department of Education funds for which it is eligible under applicable program statutes and regulations or from using such funds, as appropriate, to support activities under its desegregation plan. (Public Law 98–139. Department of Education Appropriation Act, 1984.)

1984 Conclusion of Law No. 125(h).

At the hearing concluded on March 28, 1984, counsel for the Board asked the director of the Department of Education's budget service whether § 309 constituted "negative earmarking." Transcript of March 28, 1984, at 1078. In reply, the director stated that § 309 does not preclude the Board from applying for funds under existing federal programs. *Id.* The transcript does not make clear, however, whether § 309 would specifically prevent Congress from making any funds available for the Board's desegregation plan, other than the funds granted by the Yates Bill and the funds available under existing programs. On remand, the district court may take further evidence to determine whether § 309 would have such an effect and thus would constitute a possible bad faith violation of ¶ 15.1 of the Decree.