UNITED STATES of America, Plaintiff,

v.

BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant.

No. 80 C 5124.

United States District Court, N.D. Illinois, E.D.

June 4, 1985.

Margaret Gordon, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Robert C. Howard, Hartunian, Futterman & Howard, Hugh R. McCombs, Isham, Lincoln & Beale, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The Court must once again referee a skirmish in the ongoing battle between the United States and the Board of Education of Chicago ("the Board") over the obligations of the United States under the consent decree it signed in this desegregation action. The United States has moved to vacate a preliminary injunction which restrains certain Department of Education ("DOE") funds. The injunction was entered on June 30, 1983, see 567 F.Supp. 272, 285 (N.D.Ill.1983) (Shadur, Jr.), affirmed by the Court of Appeals, 717 F.2d 378, 385 (7th Cir.1983), and has remained in effect (with some modifications from time to time releasing small fractions of the money). For the reasons stated below, we deny the motion to vacate, except for some modifications of the amounts restrained.

I.

The complex history of this unique desegregation case has been detailed in the previous appellate and trial court opinions. See 744 F.2d 1300 (7th Cir.1984), cert. denied, — U.S. —, 105 S.Ct. 2358, 86 L.Ed.2d 259 (U.S.1985) ("Board II"); 717 F.2d 385 (7th Cir.1983) ("Board I"); 588 F.Supp. 132 (N.D.Ill.1984); see also N. Devins & J. Stedman, New Federalism in Education: The Meaning of the Chicago School Desegregation Cases, 59 Notre Dame L. Rev. 1243 (1984). In view of the parties' need for a prompt ruling on the pending motion, we will not reproduce the extensive history printed in the above references. Rather, we will state only the most crucial facts and then develop facts as they become relevant in our legal discussion below.

The case centers on ¶ 15.1 of the consent decree entered in this case in 1980, which states:

Each party is obligated to make every good faith effort to find and provide every available form of financial resources adequate for the implementation of the desegregation plan.

The Seventh Circuit held that that provision "imposes a substantial obligation on the government to provide available funds to the Board." Board I, 717 F.2d at 383. But the most recent Seventh Circuit opinion narrowed the definition of "available funds" and the scope of the government's obligation to provide these funds. According to the higher court, ¶ 15.1 does not require the government to lobby for desegregation funds, to reprogram funds for use by the Board or to provide direct grants for school desegregation. 744 F.2d at 1307. But ¶ 15.1 does require the government to put the Board "at the top of the list' for any program grants that can be applied to desegregation assistance and for which the Board is eligible." 744 F.2d at 1305. The Court held that by so "guaranteeing that the Board will be funded on a priority basis under existing school desegregation programs, the amount of which funding is

determined by program criteria and is subject to the review of the district court, the government would comply with our interpretation of ¶ 15.1...." 744 F.2d at 1305–06. The Court remanded to this Court for a "determination of whether the Board is receiving the maximum level of funding that is available under the criteria of programs through which funds for desegregation can be disbursed." *Id.* at 1306.

The parties are concluding discovery and preparing briefs for this remand determination. Although the Court of Appeals was silent about the continuing restraint of DOE funds pending our decision, the United States has moved to vacate the restraint immediately, before this Court can fulfill its mission on remand of deciding whether the Board is entitled to some of the funds under restraint. The motion rests on two grounds. First, Congress passed a bill, the so-called "Weicker Amendment," ordering this Court to release the money, Pub.L. 98–139, 97 Stat. 871, § 309 (1983), and the United States argues that we must apply that law. Second, the United States asserts that traditional principles of equity no longer support continued injunctive relief.

In response, the Board has agreed to release some of the funds and conceded that *Board II* foreclosed its chances of recovering certain other funds. The Court issued a short order releasing these funds.[1] As for the rest of the money, the Board agrees that the Weicker Amendment orders this Court to release the funds, but it argues that the statute unconstitutionally violates basic principles of separation of powers. The Board also asserts that traditional equitable concerns demand continued restraint of the money.

Clearly, this Court should decide the equitable issue first. If we rule that equity no longer compels restraint, we moot the constitutional issue. If equity continues to warrant restraint, however, then we will grapple with the Weicker Amendment.

## II.

### A.

The funds were originally restrained because the Court thought they could potentially satisfy the government's obligations to the Board under the consent decree. They have been restrained to preserve the status quo until the Board's entitlement to them could be determined. "Given the possibility that these funds might otherwise be spent and given the need to protect the interests of the Board by preserving the status quo ... the district court did not abuse its discretion by imposing the freeze." *Board I*, 717 F.2d at 385. The Board's entitlement to these funds still has not been finally determined. That is what these remand proceedings are all about. The motion to vacate, then, is an attempt to disrupt the status quo *before* we can determine the Board's entitlement to the funds. This attempt is made in good faith, since *Board II* has changed the Board's chances of recovering these funds. Nevertheless, we conclude below that concerns of equity still warrant preservation of the status quo through continuing restraint on the funds until we decide the merits in the next few weeks.

 The Seventh Circuit recently redrafted the traditional equitable test for preliminary injunctive relief. To obtain relief the plaintiff must show that (1) he has no adequate remedy at law and will suffer irreparable harm if the preliminary injunction is not granted; (2) the irreparable harm he would suffer outweighs the irreparable harm defendant would suffer if the injunction is granted; (3) he has some likelihood of succeeding on the merits; and (4) the desired injunction would not frustrate the "public interest." *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386–88 (7th Cir.1984) (reh'g and reh'g en banc denied). The requirements of "irreparable harm" and "likelihood of success" are intertwined. As a threshold matter, the

---

1. Specifically, we released 30% of the funds restrained in the "Follow-Through" program and the "National Diffusion Network" program.

We also released funds contained in the so-called "Special Programs" account.

plaintiff must show that his chances "are better than negligible." *Id.* at 387. If the plaintiff shows this, the Court must decide how likely that success is, "because this affects the balance of relative harms." *Id.* A sliding scale applies. "The more likely the plaintiff is to win the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.*

The parties dispute whether, in light of *Board II*, the Board continues to meet the last two requirements—"likelihood of success" and relatively insignificant harm to "the public interest." Before reaching those two elements, we reaffirm that the Board easily satisfies the first two elements. It clearly has no remedy other than from the restrained funds. Were we to lift the restraint, the government would spend some of the money on other grantees (except for the amount it has decided, without this Court's approval, is proper to grant to the Board) and allow the rest to lapse into the Treasury. These events would surely harm the Board—and, of course, the children of Chicago—irreparably were we to rule on the merits that the Board is entitled under ¶ 15.1 to more than the Secretary has decided to grant. In sum, we agree completely with the Baord that the restrained funds provide the only realistic and meaningful source of relief should it prevail on the merits. Second, the balance of harms *viz.* the Board and the government tips strongly in the Board's favor. Indeed, the government fails to show that it would be harmed in any significant way by the continued restraint. Instead, it details how continued restraint would harm nonparty intended grantees of the funds. This harm is relevant to the "public interest" factor, which we will discuss later in Section C.

### B.

■ The parties hotly dispute whether the Board is "likely to succeed" in showing it has any entitlement to the restrained funds. Obviously, if the Board's likelihood of success is zero or negligible, all of the irreparable harm in the world cannot stop the Court from releasing the funds.[2] But if its likelihood of success is "better than negligible," then, as noted above, the degree of irreparable harm suffered by the Board figures into the "success" calculus by way of a sliding scale. *Roland Machinery*, 749 F.2d at 387–88. Because the balance of harms between the parties tips so very strongly in the Board's favor, we conclude that the sliding scale approach requires only that the Board meet its threshold showing that its chances of succeeding are more than negligible. In other words, where as here the balance "tips sharply in [plaintiff's] favor," the plaintiff need only show that "serious questions are raised." *Roland Machinery*, 749 F.2d at 388.

■ The restrained funds fall into several different programs. We will approach the "success" issue program by program.

#### 1. *Title IV*

There are about $24 million in FY 1984 Title IV funds under restraint of which the Secretary has determined that the Board is entitled to $428,000, as well as FY 1983 Title IV funds, of which the Secretary has allotted some $600,000 for the Board. The Secretary concedes that the "top of the line priority" funding applies to Title IV funds. It argues that it already has given the Board this priority and that the Board will receive its "equitable fair share of funds," and thus we should release all of the funds.

We disagree. The Seventh Circuit remanded this case for the *court*, not the Secretary, to determine on a full record whether the Secretary has discharged his substantial obligation of providing the maximum level of available funding under desegregation program criteria. The Secretary has conceded that this Court may review his discretion in distributing "funds that may be used for desegregation pur-

---

**2.** For that reason, we have already ordered that certain funds be released immediately. *See* n. 1, above.

poses." 744 F.2d at 1306 n. 7. It follows that his assertion that he has given the Board its "equitable fair share" of funding does not convince us that the Board's chances of receiving more are negligible. The Secretary might be right, but that is for *us* to decide after a thorough inquiry into all of the relevant evidence now being produced in discovery. Releasing the funds before we can rule on the merits would have the effect of mooting the remand proceeding because the Court would be impotent to give the Board any relief. This would in turn mean that the determination of the maximum level of funding was, in effect, solely within the Secretary's discretion. That is not what the Court of Appeals contemplated.

Moreover, although this Court is new to the case, we cannot close our eyes to its history. It cannot be seriously disputed that through most of this case the United States has been virtually unyielding in its intention to give the Board as little as possible. The government did finally loosen up a bit in its concessions before the Seventh Circuit, *see* 744 F.2d at 1305, but we cannot presume that the Secretary has been as generous as ¶ 15.1 requires him to be. On the contrary, the government's past conduct in this case, which "could be

interpreted to contravene the spirit of the Decree ... and cannot enhance the respect to which this Decree is entitled," *id.* at 1308, compels us to approach the case with quite a bit of skepticism. At this point, we cannot reasonably say that the chances are merely "negligible" that the Secretary has underestimated the Board's " 'equitable fair share' of funding under Title IV criteria." *Id.* at 1305.[3]

### 2. *Discretionary Funds*

There are some $17 million in the "Discretionary Fund" under restraint.[4] The Secretary has awarded none to the Board. The parties dispute how much of this money is really under the Secretary's actual discretion and subject to his control. We think that the Board has raised "serious questions" as to the availability of these funds, which warrant continued restraint until we can resolve those questions on the merits.

■ The Secretary concedes that $3,384,-000 of the total, which was allocated for a grant competition, was available for desegregation assistance for the Board's plan. We clearly must hold these funds to make sure the Board received its "equitable fair share" of these funds.[5]

---

**3.** Indeed, the Board points out that it has learned through discovery that DOE personnel responsible for the "priority" treatment had never heard the phrase "equitable fair share." In contrast, the Secretary discusses evidence which supports his contention that the Board has received extraordinary treatment. This dispute underscores the necessity of continuing the restraint on the Title IV funds. At this point, we do not know who is right, but there is a real dispute on the issue, which the Board has some chance of winning.

**4.** In FY 1984, Congress appropriated about $28 million for this fund. About $10 million of this total is required to be spent to finance certain non-desegregation programs specified at 20 U.S.C. § 3851(b). The remaining funds are under restraint and in dispute.

**5.** The Secretary's primary argument concerning these funds is that the Board waived whatever rights it might have had by never formally applying for the funds. Viewed in the context of this bitter lawsuit, this argument is sophistry. The Secretary has known full well since FY 1983 that the Board has claimed an entitlement

to money in the Discretionary Fund. This Court and the Court of Appeals have known this, and that is why these funds were enjoined in the first place. Yet until *Board II,* the Secretary insisted that the Board's plan was not entitled to Discretionary Fund moneys. A formal application would have been futile. It is disingenuous to insist first that the funds are off limits, only to later concede that they are available, but that the Board never formally asked for them. The Court will not tolerate such a facile creation of a Catch–22. In any event, as the Secretary himself has maintained throughout this suit, ¶ 15.1 imposes at the very least a duty on the Secretary to provide technical assistance to the Board in locating potentially available funds. The Secretary should have been encouraging the Board to apply for these funds and helping it with any formalities in doing so. The Secretary cannot now rest on such a formalistic, technical ground when he has been so adamant and unhelpful in the past and when a consent decree binds him to be otherwise. We disagree with the Secretary that *Board II* imposes such a barrier for failure to formally apply for funds while this suit had been pending.

The Board's claim to the rest of the funds is somewhat weaker in light of the Seventh Circuit's recent opinion. For example, the Secretary allocated about $2.4 million for purposes other than desegregation.[6] The Seventh Circuit seemed to condone general policy decisions by the Secretary which have the effect of rendering funds unavailable to the Board. 744 F.2d at 1307 & n. 10. The Secretary therefore argues that the Board has no reasonable claim of entitlement to these funds. Rather, the Secretary claims his discretion is bound *only* at the time that grantees are selected and grant award amounts are set pursuant to statutory and regulatory criteria.

The Board does not argue this point at length, saying it will do so in its brief on the merits. It does briefly state, though, that the *Board II* opinion "requires the United States to take the Consent Decree into account in allocating and providing the Board a share of all of the nonstatutorily mandated funds." Board's Memorandum in Opposition to Motion to Vacate at 56 n. 25. Thus, the Board appears to argue that the Seventh Circuit's exemption of "reprogramming" from the scope ¶ 15.1 extends only to *statutorily* mandated funds, not to funds wholly within the Secretary's discretion. It would distinguish reprogramming of funds from programming of funds in the first instance. The Board argues that even under *Board II*, the consent decree must inform the Secretary's discretion *before* he programs discretionary funds.

While at this time we think *Board II* probably favors the Secretary's position on this issue, the opinion is not entirely clear, and the Board has raised a plausible, serious question which deserves full briefing on the merits following discovery.[7] *Board II* does appear to focus on reprogramming of statutorily mandated funds. 744 F.2d at 1307 n. 9. But footnote 10 seems to give the Secretary great leeway even within the Discretionary Funds, and the Board will have to contend with this in its brief on the merits. However, the Court did explicitly hold that "top of the list priority" does reach the Discretionary Fund, 744 F.2d at 1305 & n. 6, although it is not clear that the Court was speaking about all or part of the fund. Moreover, the opinion stated that the Secretary's obligations were not necessarily limited to "desegregation" programs *per se*, but rather extended to other funds which "Congress had indeed made available." *Id.* at 1306. In sum, at this point the scope of footnote 10 is unclear, as is the point where the Secretary's discretion becomes subject to the Court's review. If we were to release the funds now, we would be resolving our doubts conclusively in favor of the Secretary, thereby precluding the Board from recovering at all should it prevail ultimately on the merits. In light of this potential great harm to the Board and of our desire and duty to resolve this substantial issue on the basis of a fully developed record, we believe it necessary to continue restraining the $2.4 million.

Also in dispute are $10 million which the Secretary has allocated for the "National Diffusion Network" ("NDN") program.[8]

However, in the *future* the Board should make every effort to comply with formal administrative requirements. At the same time, the Secretary should help the Board do so, alert it to available resources and not merely lie in wait for the Board to overlook dotting an "i" or crossing a "t."

6. For example, the Secretary decided to allocate these funds for programs such as educational television projects, teacher pay incentive projects and various computer projects.

7. We have some sympathy for the Board's argument that the Secretary's position allows him to escape ¶ 15.1 merely by reallocating funds *pro forma* into program categories untouchable by the Board. However absurd this result may be, the question for the merits will be not whether this result makes sense, but whether *Board II* accords the Secretary the leeway to designate funds in this way without regard to ¶ 15.1.

8. NDN funds exemplary "developer demonstrator" projects in a number of subjects, including math, reading, geology and marine science. "State facilitators" inform and train local school districts about these projects. The program saves school districts the time and cost of developing new programs on their own.

The Board has already agreed to release 30% of these funds to allow current grantees to continue operating. The Secretary claims that these funds were earmarked by congressional committee for this program. Thus, he argues that these funds come within *Board II's* holding that to satisfy ¶ 15.1, the Secretary need not request that funds be reprogrammed. The Board argues that committee language is not binding on the Secretary's discretion and thus not dealt with by the Seventh Circuit's opinion. The Board also argues that it may qualify for funds under NDN criteria. The Board's first argument raises issues analogous to those discussed above concerning the point at which the Court can review the Secretary's discretion. As we wrote above, it is best to decide that question after considering arguments on the merits. In any event, the second argument warrants continued restraint because the Board has raised a serious question as to whether some NDN funds could directly aid the Board's desegregation plan. The parties dispute whether these programs really deserve "top of the list" treatment within the meaning of *Board II.* That, too, we leave for the merits.[9]

### 3. *Follow-Through*

Close to $15 million of funds in the "Follow-Through" program are now under restraint.[10] The parties agree that some of the Board's desegregation programs satisfy criteria of the statute. The parties dispute, however, whether Follow-Through can be considered a "program through which funds for desegregation can be disbursed," 744 F.2d at 1306, within the meaning of *Board II.* The United States contends that, although the Board's plan contains projects which might qualify for Follow-Through money, only programs that

explicitly have "desegregation" funding as a statutory purpose fall within the Seventh Circuit's reading of ¶ 15.1. Follow-Through is not such a program. Not surprisingly, the Board's reading of *Board II* is much broader. It apparently concedes that Congress did not have desegregation on its mind in enacting Follow-Through, but it argues that because its broad desegregation plan contains projects which could qualify for Follow-Through, that program can be considered one of "desegregation" for purposes of ¶ 15.1. We think that either reading is plausible. We have earlier indicated that the label "desegregation" might not be as narrow as the Secretary contends. *United States v. Board of Education,* No. 80 C 5124, slip op. at 2 n. 1 (N.D.Ill. April 15, 1985) (unpublished memorandum order). But for now we hold only that the Board has persuaded us that a serious question exists as to the availability of these funds, warranting continued restraint until we render a decision on the merits.[11]

### 4. *Excess Appropriations*

About $35 million of FY 1983 and 1984 funds are so-called "excess appropriations." These are unspent funds which would lapse into the Treasury if we were to decide that the Board has no entitlement to them.

In its brief the United States divides these funds into three categories: (1) funds appropriated for statutory purposes outside the scope of the Board's desegregation plan; (2) funds which could further programs within the Board's plan, but which are mandated by statutory formulas over which the Department has no discretion; and (3) funds which could further the Board's plan and from which the Board already has received funding.

---

**9.** As we hold below, at 14, however, after taking "the public interest" into account, we deem it appropriate to release an additional 10% of the funds under restraint.

**10.** "Follow-Through" is authorized under 42 U.S.C. § 9861–9868 to help develop low income children in kindergarten through third grade. A descendant of "the Headstart" program, it provides comprehensive services in the areas of

physical and mental health, social services and nutrition, as well as educational programs. Follow-Through was not conceived of as a "desegregation" program *per se.*

**11.** Once again, however, we rule below that "the public interest" warrants release of an additional 10% of these funds now under restraint.

It is clear that the funds in Category 3 must continue under restraint. We think that a serious question exists as to whether the "priority" funding requirement applies to these funds, and if so, whether the Board received its equitable fair share of these funds. Thus, these funds should remain under restraint until we reach the merits.

Category 2 presents the same questions as the Follow-Through funds do: whether programs which could further the Board's plan, but which were not intended by Congress for "desegregation" *per se*, fall within the scope of ¶ 15.1 as defined by the Seventh Circuit. We have already indicated that the label "desegregation" should not necessarily be read narrowly. We leave that decision for the merits. For now we continue restraint of funds in Category 2 until we resolve that serious question.

The Secretary's case concerning Category 1 is much stronger. It could be said that the Seventh Circuit's holding that the Secretary need not reprogram statutorily mandated funds precludes the Board from recovering any of these funds. But the Seventh Circuit did not address the Secretary's duty concerning funds which would lapse into the Treasury. Arguably, there is a material distinction between lapsed and spent funds. Indeed, the Seventh Circuit did recognize a duty to search "for unencumbered funds that may be used to advance the Board's desegregation plan." 744 F.2d at 1306–07. These might be such "unencumbered funds." We do not decide now whether the Secretary has a duty to try to reprogram these funds.[12] But it is plausible to assert that the Seventh Circuit's concern for separation of powers and competing grantees is less relevant to the excess appropriations, and that the Secretary could have a heightened duty with respect to these funds. For now we hold merely that the Board has some more than negligible likelihood of establishing some entitlement to these funds.

*5. Summary*

It is apparent from our discussion that the Board's claim to some of the funds has become weaker in light of *Board II*. Yet we have continued the restraint even to some of the funds to which its claim has weakened. We have done so because our "task ... in deciding whether to grant or deny a motion for preliminary injunction is to minimize errors." *Roland Machinery*, 749 F.2d at 388. Because the harm to the Board is so great if we release the funds and later find out it had some entitlement to them, and because the harm to the government is minimal, in our judgment if we err, we should do so on the side of caution. The costs of error are minimized if we continue restraining the funds for the month or so it will take to resolve the Board's entitlement to them once and for all. However, although *Roland Machinery* speaks only about the relative harms to the *parties* in applying the "sliding scale," we agree with the Secretary that in this unique case the harm to the "public interest" must be factored into the sliding scale before we finally end our analysis. We turn next to that factor. We conclude that this factor does not significantly affect the above calculus at this time.

---

12. We think that the funds in Category 1, as well as the rest of the excess appropriations, could form the basis for a settlement of the current funding dispute. Although the Seventh Circuit held that the letter of the consent decree did not require the Secretary to reprogram funds, it did state that the Secretary has violated the "spirit" of that decree, and it did not specifically address the duty to try to reprogram excess funds. The Secretary would further the spirit (if not the letter) of the decree if he would voluntarily seek to have a substantial amount of the excess appropriations, including those in Category 1, reprogrammed for use by the Board. It would be most unfortunate if the Secretary were to allow these funds to lapse without doing anything about it. In the interests of settling this dispute, Congress might well heed a reprogramming request. Such a request would, if nothing else, confirm that the Secretary has taken a more generous and good faith attitude toward the Board. And if much of these funds could be released, we are confident that the Board could agree to drop its claim to many of the funds now earmarked for other grantees. It might be too late to expect realistically such cooperation between the parties. But that is what ¶ 15.1 envisioned in the first place at least in spirit.

## C.

Except for the "excess appropriations," much of the money under restraint has been scheduled to be allocated to various grantees all over the country. The Secretary has submitted affidavits of various grantees, which paint a moving picture of how the injunction has seriously disrupted their programs. The Board does not dispute that the injunction has harmed other grantees. Rather, it argues in part that the Secretary, not the Board or this Court, is to blame for this harm. The Secretary's litigation tactic, the Board says, has been to foment this conflict between the Board and other grantees, and the Secretary has consistently opposed measures which would have ameliorated this conflict. Thus, the Board argues that the Secretary's professed concern for the grantees is disingenuous and a mask for its own dilatory and obstructive conduct throughout this suit. It contends that the suit would have been over long ago but for the Secretary's refusal to give any ground initially. Judge Shadur agreed with the Board's assessment. *See* 588 F.Supp. at 138.

We need not decide who is to blame for the harm to the grantees. Even if we view their admitted, serious harm without regard to whether or not the Secretary created this harm as a litigation tactic, we believe that the injunction should stand for the time being. First, much of the harm detailed in the affidavits has unfortunately already happened. We cannot do anything about that. We can and should, however, seek to minimize future harm. That will be the focus of our inquiry. The Board has persuaded us that this harm is relatively minimal if the injunction remains in effect for the month or so it will take to resolve the merits. First, it has agreed to release 30% of the restrained funds in the Follow-Through and NDN programs to allow grantees to continue operating in the meantime. To further ameliorate any potential harm to grantees, we will order the release of an additional 10% in each of these pro-

grams. It is highly unlikely that the Board could recover a full 70% of the original total, so release will insure the grantees further without seriously jeopardizing the Board. The future harm to grantees of the other programs has been minimized as well. Discretionary Fund grantees generally are funded through September. Title IV grantees are funded through June 30, 1985.[13] And harm to grantees is, of course, irrelevant to the excess appropriations. In sum, then, the prospective harm to grantees is not minimized to the point where it clearly does not outweigh the potential harm to the Board.

We do not believe the future "uncertainties" or "loss of momentum" these grantees face warrant lifting the injunction now rather than a month from now. First, the grantees have long known that program funds were uncertain and contingent upon this Court's determination of the Board's entitlement to them. *See* 48 Fed.Reg. 56255 (Dec. 20, 1983); 48 Fed.Reg. 50919 (Nov. 4, 1983); 49 Fed.Reg. 7551 (Feb. 29, 1984); 49 Fed.Reg. 2462 (Jan. 19, 1984). Second, "loss of momentum" can be repaired more easily by later receipt of funds than can the Board's harms, which would go completely unremedied if the funds were released and it prevailed. Finally, the grantees' status is uncertain anyway, since the United States has actually opposed Congressional appropriations for many of the programs and is likely to do so in the future. We do not mean to dismiss lightly the past harms suffered or the problems of uncertainties. Rather, we believe that the potential harm to the Board dwarfs the *potential* harm to the grantee from a continued restraint for a short time.

## III.

Having decided that traditional equitable principles warrant continued restraint of most of the funds, we must now address

---

**13.** Since oral argument will not take place until July 1, 1985, it might become necessary to release some of these funds before the end of June. We urge the parties to try to agree to a proper amount to be released, in the likely event it becomes necessary to do so.

the impact of the Weicker Amendment. That statute provides:

No funds appropriated in any Act to the Department of Education for fiscal years 1983 or 1984 shall be withheld from distribution to grantees because of the provisions of the order entered by the United States District Court for the Northern District of Illinois on June 30, 1983: Provided, that the court's decree entered on September 24, 1980, shall remain in full force and effect.

Pub.L. No. 98–139, 97 Stat. 871, § 309 (1983). The parties now agree that this statute clearly directs this Court to release the restrained funds,[14] but does not affect the Board's ultimate entitlement to them. The Weicker Amendment is, in essence, a legislative reversal of this Court and the Court of Appeal's rulings that equity compels restraint of the funds until the Board's entitlement to them is decided on the merits. It is a legislative attempt to restore the "pre-freeze" status quo in this one case and to prevent us from again exercising our equitable powers as we have just done above.

Judge Shadur has considered the meaning and relevance of the Weicker Amendment at length. 588 F.Supp. at 229–37. We agree with his assessment. Specifically, like Judge Shadur, we are troubled that the statute reverses a particular judicial order in a particular case. *Id.* at 235. As such, the statute very likely invades the judicial province and violates fundamental constitutional principles of separation of powers. We need not repeat here the legal analysis relevant to this issue. *See* 588 F.Supp. at 233–37. Nor need we actually decide the constitutional issue. Once before, in similar circumstances, Judge Shadur avoided the constitutional issue by stating that he would comply with the Weicker Amendment and release the funds after the

imminent issuance of an order in conformance with that opinion. Similarly, this Court will avoid the unnecessary resolution of a difficult constitutional issue by releasing the restrained funds when we decide the merits next month. This course is the more prudent one, we believe, as it also respects principles of separation of powers. We could hold now that the statute (in all likelihood) is unconstitutional, thereby vindicating principles of separation of powers in that intrusive way. But it is better, we think, to serve those principles by simply obeying the legislative mandate next month, after having ruled on the merits and mooted the constitutional issue.

### IV.

In sum, the Secretary's motion to vacate is denied, with the following exceptions. An additional 10% of the funds restrained in the NDN and Follow-Through programs shall be released. In all other respects, the funds shall continue to be restrained. It is so ordered.

---

**14.** The emphasis of the Secretary on *Bradley v. School Board of the City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), is largely beside the point. Judge Shadur has already indicated that *Bradley* requires the Court to apply that law to this pending case unless doing so would cause "manifest injustice." 588 F.Supp. at 234. The Board does not seriously

dispute this point. But the extensive *Bradley* analysis done by the Secretary does not directly address the central issue: not whether this Court should apply the Weicker Amendment, but rather, whether it can do so constitutionally. Obviously, *Bradley* does not compel the Court to apply an unconstitutional law, whether it be considered retroactive or prospective.